Ricardo Lloyd JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 1340–93.

Court of Criminal Appeals of Texas, En Banc.

Nov. 15, 1995.

Rehearing Denied Nov. 15, 1995.

---

John D. Nation, Dallas, for appellant.

Robert P. Abbott, Assist. Dist. Atty., Dallas, Robert A. Huttash, State's Atty., Austin, for State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

WHITE, Judge.

Our prior opinions are withdrawn.

The trial court convicted appellant of the offense of aggravated possession of cocaine with the intent to deliver. See TEX. HEALTH & SAFETY CODE ANN. § 481.102(3)(D), and § 481.112(a) & (c). On original submission, this Court vacated the judgment of the Court of Appeals and remanded the instant cause to the Court of Appeals "to reconsider appellant's suppression argument by reviewing the totality of the circumstances of appellant's arrest in light of *California v. Hodari, D.*"[1] *Johnson v. State*, 825 S.W.2d 126, at 127 (Tex.Cr.App. 1992). On remand, the Court of Appeals complied with the order of this Court. Sitting en banc, the Court of Appeals affirmed appellant's conviction. *Johnson v. State*, 864 S.W.2d 708 (Tex.App.—Dallas 1993). This Court granted appellant's petition for review.

In his only ground for review, appellant asserts:

"The Court of Appeals erred in following the holding in *California v. Hodari, D.*, [499 U.S. 621] 111 S.Ct. 1547 [113 L.Ed.2d 690] (1991) and holding that appellant was not seized within the meaning of Article 1, § 9 of the Texas Constitution either when police officers confronted him in the breezeway of the apartment complex or when police officers pursued appellant."

We will affirm the decision of the Court of Appeals.

1. *California v. Hodari, D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

### I. The decision of the Court of Appeals

Appellant argued before the Court of Appeals that he was "detained" or "stopped" under TEX.CONST. Art. I, § 9, either when the arresting officers initially confronted him in the breezeway or when the officers chased him and made a show of authority by shouting at him to stop. In its opinion,[2] the Dallas Court of Appeals explained it understood "a seizure, for purposes of article one, section nine, to occur when the police have intruded on the freedom of a citizen by momentarily detaining the person. The mere approach of police officers that does not interfere with one's freedom of movement and causes only minimal inconvenience and loss of time is not a seizure." *Johnson v. State*, 864 S.W.2d, at 715; and cases cited therein.

In applying this holding to the facts, the Court of Appeals found when,

> "the officers walked around the corner into the breezeway, they did nothing that would lead a reasonable innocent person to believe that he was not free to leave. Their mere presence in this case did not constitute a show of authority. The officers' mere presence in no way intruded on Johnson's freedom by momentarily detaining him. Thus, Johnson was not seized under the Fourth Amendment or article one, section nine, when the officers made their presence known by walking into the breezeway and within the view of Johnson and the other two men."

*Johnson v. State*, 864 S.W.2d, at 716.

The Court of Appeals then faced the issue whether, under Art. I, § 9, appellant was seized when the officers showed their authority by chasing appellant and shouting at him to stop. The Court of Appeals began by analyzing Art. I, § 9, to determine if it provides more protection than the Fourth Amendment on this issue:

> "*Heitman* clearly gives us the authority to grant defendants greater rights under the Texas Constitution than afforded by the Supreme Court's interpretation of the United States Constitution. Because we **can** do so, however, does not mean that we **should** do so. State precedent existing before the Fourth Amendment was made applicable to the states does not support granting defendants greater rights under article one, section nine than they currently enjoy under the Fourth Amendment."[3] (emphasis supplied in original.)

*Johnson v. State*, 864 S.W.2d, at 718.

Though yielding to precedent in *Heitman*, the Court of Appeals held that Art. I, § 9 does not provide more protection for appellant than does the Fourth Amendment. They believed Art. I, § 9, does not show "an intent to provide a defendant greater protection under the state constitution than that provided under the Fourth Amendment. See TEX.CONST. Art. I, § 9 interp. commentary (Vernon 1984) ("[T]he language of Article I, Section 9 of the Texas Constitution is substantially the same as that used in the [the Fourth] Amendment.")." *Johnson v. State*, 864 S.W.2d, at 719–720; and sources cited therein.

Yet, under *Heitman*, the Court of Appeals recognized it could look to interpretations of the Fourth Amendment only as advisory in interpreting Art. I, § 9, and not as controlling authority. Where the Supreme Court's interpretation of the Fourth Amendment conflicts with Texas public policy or our own interpretations of the Texas Constitution, Texas precedent controls so long as it does not call for a restriction of the rights provided for a defendant under the Federal Constitution. The Court of Appeals then sought to "examine the rationale underlying the Supreme Court's decision in *Hodari* and determine whether its conclusion is consistent with Texas precedent and sound public policy." *Johnson v. State*, 864 S.W.2d, at 720–721.

Applying the definition of "seizure" in *Hodari D.* to the text of Art. I, § 9, the Court of Appeals determined that furthering a public policy of encouraging compliance with a po-

---

**2.** The parties in the instant case do not dispute the accuracy of the Court of Appeals' account of the factual background of the arrest of appellant. See *Johnson*, 864 S.W.2d, at 712–713. We will not recount those facts in this opinion.

**3.** *Heitman v. State*, 815 S.W.2d 681 (Tex.Cr.App. 1991).

lice officer's show of authority will not infringe upon a citizen's right to be free from an unreasonable seizure. The Court of Appeals found that if a fleeing suspect stopped "as a result of the officer's show of authority or if he is physically forced to stop, then he will be "seized" under article one, section nine. As long as he chooses to ignore the officer's show of authority, he will not be permitted to claim that the show of authority interfered with his liberty." *Johnson v. State*, 864 S.W.2d, at 722.

The Court of Appeals reasoned a suspect will always be able to contest lawfulness of the seizure in court, and the State will always be required to meet the burden of proving beyond a reasonable doubt the police had a reasonable suspicion to investigate.

> "Requiring that a suspect yield to a show of authority or be physically stopped by the police before being deemed "seized" under article one, section nine serves the public interest by encouraging compliance with police orders without sacrificing the suspect's constitutional rights to challenge the lawfulness of those orders and invoke the statutory exclusionary remedy."

*Johnson v. State*, 864 S.W.2d, at 723. The Court of Appeals adopted the conclusion reached by the Supreme Court in *Hodari D.* to determine when a citizen is seized under Art. I, § 9.

The Court of Appeals then applied this ruling to the facts of the instant case. When the officers chased appellant and shouted at him to stop, their actions "constituted a show of authority that would lead a reasonable innocent person to believe that he was not free to leave." Had appellant complied with this show of authority, the Court of Appeals believed he could claim to have been seized.

When appellant continued to flee from the officers, the Court of Appeals found the officers' actions did not have a coercive effect on appellant. The Court of Appeals held "the officers' pursuit of Johnson and ordering him to stop did not constitute a seizure of Johnson under article one, section nine." *Johnson v. State*, 864 S.W.2d, at 723–724.

Lastly, the Court of Appeals decided that appellant was seized when he complied with the officers' orders, with their guns drawn, for him to drop his gun and to stop. "Clearly, a reasonable innocent person would not feel free to leave when two police officers with guns drawn order him to stop.... When Johnson complied with the officers' orders and stopped, the second prong of the test for seizure was met and he was, at that moment, seized under both the Fourth Amendment and article one, section nine." The Court of Appeals also found appellant was seized when he dropped the gun and, simultaneously, the Crown Royal bag containing the drugs.

The Court of Appeals concluded that when the officers saw appellant in possession of the handgun before he dropped it in response to their orders, "they had probable cause to arrest Johnson for unlawfully carrying a weapon at the time they seized him." The Court of Appeals held the subsequent search of the Crown Royal bag was a "lawful warrantless search incident to a lawful arrest." *Johnson v. State*, 864 S.W.2d, at 724.

## II. The Dispute Before this Court

As noted above, appellant has only asked us to decide if the Court of Appeals erred when it relied on *California v. Hodari, D.*[4] in deciding appellant was not seized under Art. I, § 9 "either when police officers confronted

---

4. Several other Courts of Appeals have relied upon *California v. Hodari, D.* to decide when a seizure has occurred. In most of these cases, the Courts of Appeals were asked to resolve these disputes on Fourth Amendment grounds. See *Taylor v. State*, 820 S.W.2d 392 (Tex.App.—Houston [14th Dist.] 1991); *Mitchell v. State*, 831 S.W.2d 829 (Tex.App.—Houston [1st Dist.] 1992), review refused; *Johnson v. State*, 838 S.W.2d 906 (Tex.App.—Corpus Christi 1992), review refused; *Prodhomme v. State*, 839 S.W.2d 494 (Tex.App.— 1992); and *Lookingbill v. State*, 855 S.W.2d 66 (Tex.App.—Corpus Christi 1993).

In *State v. Rose*, 844 S.W.2d 911 (Tex.App.— Tyler 1992), the Court of Appeals resolved this issue on Art. I, § 9, grounds. In their opinion, the Court of Appeals stated that our opinion in the instant cause, which abated the appeal and remanded the cause to the Dallas Court of Appeals for reconsideration, led them to believe that *"Hodari, D.* should be followed in weighing challenges under both the State and Federal Constitutions." *State v. Rose*, 844 S.W.2d, at 912.

him in the breezeway of the apartment complex or when police officers pursued appellant."

Appellant attacks the opinion of the Court of Appeals as an "inadequately reasoned response to the important issues raised" in his appeal. Appellant alleges the Court of Appeals inadvertently "fused" arrests and investigatory detentions for purposes of constitutional analysis. In this fusion of arrests and investigatory detentions, appellant asserts the Court of Appeals moved police misconduct occurring prior to the time of an actual seizure outside the protection of Art. I, § 9.

In his case, appellant argues the arresting officers lacked an articulate, reasonable suspicion to detain him for purposes of investigation, and lacked the probable cause to arrest him at the point when they confronted him in the breezeway. Appellant implies he was barred from prevailing upon this argument on direct appeal by the Court of Appeals' ruling that he was not seized until he acquiesced to the arresting officers' show of authority.

Appellant urges this court to overrule the Court of Appeals. In his brief, he requests this Court not redefine seizure under Texas law in the way he saw the Supreme Court redefine seizure under the Fourth Amendment. Appellant contends this Court should let the law stand as written prior to the Supreme Court's decision in *Hodari, D.*: that a defendant has been seized before he or she is physically restrained if a reasonable person in their position would believe they were not free to leave. To appellant, this is a critical distinction because he argues that a reasonable person would not believe he was free to leave at the time appellant was confronted by the police officers in the breezeway of the apartment complex or when they pursued him.

### III. The definition of "seizure" under Art. I, § 9.

■ In the instant case, this Court must resolve whether Art. I, § 9 requires us to find that a seizure has taken place at the time a reasonable person facing a show of authority believes he or she is not free to leave (the pre-*Hodari, D.* definition of seizure) or, instead, at the time the suspect has actually yielded to the show of authority or been physically forced to yield (the *Hodari, D.* interpretation of the Fourth Amendment). In doing so, this Court will have decided whether seizure is to be defined as it was under both the Fourth Amendment and Art. I, § 9 prior to *Hodari, D.*, thereby maintaining for the people of Texas a broader definition of seizure under Art. I, § 9, or will seizure be defined under Art. I, § 9 as the Supreme Court in *Hodari, D.* defined it under the Fourth Amendment. Today, we choose the latter interpretation of Art. I, § 9.

### A.

■ A plain reading and comparison of the language of the Fourth Amendment and Art. I, § 9 reveals no substantive difference. The Fourth Amendment protects the,

> "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

Art. I, § 9 also protects a citizen's rights to be,

> "secure in the persons, houses, papers and possessions, from all unreasonable seizures or searches ..."

A literal interpretation of the text of the Fourth Amendment and Art. I, § 9 reveals their fair and objective meaning. The Fourth Amendment and Art. I, § 9 both protect the same right (freedom from unreasonable searches and seizures) to the same degree (persons, houses, papers, and effects/possessions).[5] However, this Court decided in *Heitman* that decisions of the Supreme Court interpreting the Fourth Amendment are not binding upon Texas courts in their interpretations of Art. I, § 9. *Heitman v. State*, 815 S.W.2d, at 690. Consequently, in the instant case the Court of Appeals and this Court have undertaken the task of defining "seizure" under Art. I, § 9.

---

5. We find the Court of Appeals comparison and analysis of the Fourth Amendment and Art. I, § 9 to be well researched and reasoned. *Johnson v. State*, 864 S.W.2d, at 716–720.

In the instant dispute, a distinction between the definitions of seizure under the Fourth Amendment and Art. I, § 9 would not be the product of a literal interpretation and comparison of the language in the two provisions. A valid distinction between Art. I, § 9 and the Fourth Amendment could result only from a combination of the historical constitutional analysis of Art. I, § 9 and a decision that Texas public policy is better served by diverging from the path chosen by the Supreme Court in *Hodari, D.*

■ We are not bound to apply the Court's holding in *Hodari, D.* to our interpretation of Art. I, § 9, as this Court is not bound by Supreme Court interpretations of the United States Constitution when interpreting provisions of the Texas Constitution. *Heitman*, 815 S.W.2d, at 690. Nor are we obliged to be different. "Because we can [grant defendants greater rights under the Texas Constitution than afforded under the United States Constitution] however, does not mean that we should do so." (emphasis in original) *Johnson v. State*, 864 S.W.2d, at 718.

Texas precedent existing before the Fourth Amendment was made applicable to state actions did not support granting to defendants greater protections from state actions under Art. I, § 9 than they enjoyed from federal actions under the Fourth Amendment. *Johnson, Id.*, and cases cited therein. See, also, *Brown v. State*, 657 S.W.2d 797, at 799—807 (Tex.Cr.App.1983) (Clinton, J., concurring). After the Fourth Amendment was made applicable to the States in *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), and until *Heitman* was handed down, this Court interpreted the virtually identical language of Art. I, § 9 and the Fourth Amendment to have the same meaning. *Eisenhauer v. State*, 754 S.W.2d 159 (Tex.Cr.App.1988).

■ This Court has compared the language of Art. I, § 9 and the Fourth Amendment in an attempt to discern the reason for the similarities in the two provisions. In *Eisenhauer*, this Court found any similarity between the two appears to be merely a coincidence of historical fact. *Eisenhauer v. State*, 754 S.W.2d, at 170. In *Autran v. State*, 887 S.W.2d 31 (Tex.Cr.App.1994), the plurality believed there had to be an underlying intent for the two provisions to be different because a narrow construction would leave Art. I, § 9, specifically, and the Texas Constitution, generally, void of independent meaning.[6] *Autran v. State*, 887 S.W.2d, at 38.

It would be practically impossible to discern from the language, alone, of Art. I, § 9 the intent of the citizens who framed that provision. There is little if any evidence of the intent of the Framers of Art. I, § 9. *Autran v. State*, 887 S.W.2d, at 38. We are left with the impression that the language of Art. I, § 9 is virtually identical to the language of the Fourth Amendment.

The historical context in which Art. I, §. 9 was drafted and adopted might be of some benefit to a determination of whether a "seizure" in Art. I, § 9 bears a meaning that is distinct in its origin from "seizure" in the Fourth Amendment. Art. I, § 9 was drafted at a time when the Bill of Rights did not protect individual citizens from state actions, including actions which infringed upon their right to be free from unreasonable searches and seizures. *Barron v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). This right could only be protected from the arbitrary acts of the state and its agents by a state constitution. Newman, *The "Old Federalism"; Protection of Individual Rights by State Constitution in an Era of Federal Court Passivity*, 15 Conn. L.Rev. 21, 21 (1983). At that time, the framers of the Texas Constitution chose language for Art. I, § 9 that was almost identical to the Fourth Amendment.

It is not unreasonable to conclude from these facts that the framers of the Texas Constitution chose to draft Art. I, § 9 to

---

**6.** Is "independent meaning" to be the goal of any and all analysis of the provisions of the Texas Constitution? Are we, and the Courts of Appeals, to presume that the Texas Constitution must always have a meaning independent of the United States Constitution? We do not believe a quest for "independent meaning" should be the guiding light for each effort by a reviewing court in its analysis of the Texas Constitution.

protect Texas citizens from unreasonable searches and seizures by the state in the same way they were protected from unreasonable searches and seizures by the federal government. If they had intended to grant to citizens greater protection from state actions than they enjoyed from federal actions, then they could have drafted Art. I, § 9 at that time to reflect that intent.

This does not mean that this Court's decision in *Heitman* is to be reversed, or that there will be a reversion to interpreting Art. I, § 9 in lock-step with the Supreme Court's interpretation of the Fourth Amendment. Because of the similarity of the two provisions, the Fourth Amendment decisions of the Supreme Court should be viewed, at most, as providing guidance in interpretations of Art. I, § 9. However, if the Courts of Appeals and this Court decide to raise the ceiling of the freedom of Texas citizens from unreasonable searches and seizures, it will be done by choosing in individual cases to interpret Art. I, § 9 in a manner justified by the facts of the case, state precedent on the issue, and state policy considerations.

## B.

Until the time of the decisions in *Heitman* and, then, *Hodari, D.*, this Court interpreted the issue of when a seizure has occurred in the same way as the Supreme Court: a person has been seized when a reasonable person in his position would believe he is not free to leave. *Eisenhauer v. State*, 754 S.W.2d 159, at 164 (Tex.Cr.App.1988); and *United States v. Mendenhall*, 446 U.S. 544, at 554, 100 S.Ct. 1870, at 1877, 64 L.Ed.2d 497 (1980).

In *Hodari, D.*, the Court added the requirement that a person has not been seized until he has yielded to a law enforcement officer's show of authority or when officers physically limit his movement. See *Hodari, D.*, 499 U.S., at 626–628, 111 S.Ct., at 1551. The Court explained in *Hodari, D.* that a seizure, pursuant to the Fourth Amendment, entails the use of physical force or submission to authority.

"The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain move-

ment, even when it is ultimately unsuccessful.... It does not remotely apply, however, to the prospect of a policeman yelling, "Stop, in the name of the law." at a fleeing form that continues to flee. That is no seizure."

*Hodari, D.*, 499 U.S., at 626, 111 S.Ct., at 1550.

In *Hodari, D.*, as in the instant case, the defendant urged the Supreme Court to rule that he was arrested when confronted by a show of authority by the police. But the Court declined, ruling an arrest requires either the use of physical force against a suspect or, where that is absent, submission to the assertion of authority by the suspect.

"We do not think it desirable, even as a policy matter, to stretch the Fourth Amendment beyond its words and beyond the meaning of arrest."

*Hodari, D.*, 499 U.S., at 627, 111 S.Ct., at 1551. A show of authority, without an application of physical force, to which a suspect does not yield is not a seizure under the Fourth Amendment.

As the Supreme Court did in the context of the Fourth Amendment in *Hodari D.*, this Court is left with the task of ruling what a reasonable definition of "seizure" would be in the context of Art. I, § 9. In this case, we find the appellate court's analysis of the Fourth Amendment to be persuasive when applied to Art. I, § 9. There is nothing in the language of Art. I, § 9 to indicate that the Texas Constitution would provide for a definition of seizure that did not include a requirement either that a suspect submit to a demonstration of authority, or that he be subjected to the use of physical force, in order to be considered to have been seized.

Appellant proposes in the instant case that he was seized when he was confronted by the police in the breezeway, even though he bolted and ran away at the first sight of the officers, giving no indication of any intention to yield to them. It would be ludicrous to hold that these facts prove appellant was seized before he actually yielded to the orders of the arresting officers and stopped running away from them.

To the extent that this ruling deviates from state precedent, we hold it is justified because it serves the public policy of encouraging compliance with police orders. The state legislature has fostered the policy of encouraging suspects to yield to a police show of authority. See TEX.CODE CRIM. PROC.ANN. Art. 38.04(a), and (b). The analysis by the Court of Appeals is persuasive on this issue. See *Johnson v. State*, 864 S.W.2d, at 722–723.

We hold appellant was not seized for purposes of Art. I, § 9, until he yielded to a show of authority by law enforcement officers. If appellant had not yielded to the officers' orders, he would not have been seized until he had been physically stopped or restrained by the officers.

### C.

■ Appellant also complains the Court of Appeals fused arrests and investigative detentions in its analysis. First, they did not "fuse", or otherwise blur the distinctions between, the two. For purposes of constitutional analysis, both investigative detentions and arrests are seizures. They are either reasonable because a trial or reviewing court finds they are based on a constitutionally adequate reasonable suspicion or on constitutionally adequate probable cause, respectively, or they are unreasonable. They both represent a seizure of a citizen by law enforcement officers. The differences between the two are based on the degree of intrusion involved in both seizures, and the different legal justifications required of each.

■ When reviewing an investigative detention under either state or federal law, it is accepted that "law enforcement officers may stop and briefly detain persons suspected of criminal activity on less information than is constitutionally required for probable cause to arrest." *Crockett v. State*, 803 S.W.2d 308, at 311 (Tex.Cr.App.1991); and cases cited therein. "Nevertheless, even a temporary detention of this kind is not permissible unless the circumstances upon which the officers rely objectively support a reasonable suspicion that the person detained actually is, has been, or soon will be engaged in criminal activity." *Id.*, and cases cited therein. See,

also, *Montano v. State*, 843 S.W.2d 579, at 581–582.(Tex.Cr.App.1992). An investigative detention is a confrontation of a citizen by law enforcement officers wherein the citizen yields to a display of authority and is temporarily detained for purposes of an investigation. This is a seizure of the citizen which is reviewed under Fourth Amendment and Art. I, § 9 principles to determine if the detaining law enforcement officer's suspicions of the citizen are reasonable.

■ In comparison, when analyzing an arrest under the Fourth Amendment or Art. I, § 9, the reviewing court must determine if the law enforcement officer had probable cause to arrest a citizen. Because an arrest is a more restrictive detention than an investigative detention, the State must satisfy a greater burden of proof and establish that the officer had probable cause to arrest.

■ Both an investigative detention and an arrest, as seizures, can be contrasted with a confrontation between a citizen and a law enforcement officer that is not a seizure. A law enforcement officer is permitted to approach a citizen without reasonable suspicion or probable cause in order to ask questions and even to request a consent to search. *Florida v. Royer*, 460 U.S. 491, at 497–498, 103 S.Ct. 1319, 1323–1324, 75 L.Ed.2d 229 (1983). In this example, the citizen is free to ignore the officer and walk away. *Id.* While a law enforcement officer is free to approach a citizen and ask questions, the citizen is also free to not answer the questions. These encounters are consensual so long as a reasonable person would feel free "to disregard the police and go about his business." *Hodari, D.*, 499 U.S., at 628, 111 S.Ct., at 1552. In this situation, the State is not required to prove the law enforcement officer had either a reasonable suspicion or probable cause to approach the citizen and ask questions. It was not a seizure: neither an investigative detention nor an arrest.

Arrests and investigative detentions are distinguishable by the nature of the detentions involved and the constitutional parameters which are applied to determine their legality. See *Amores v. State*, 816 S.W.2d 407, at 411 (Tex.Cr.App.1991). Pursuant to

our decision today, under the Fourth Amendment and Art. I, § 9, in either an investigative detention or an arrest, the seizure of the citizen has not occurred until a reasonable person would believe he or she was not free to leave, and that person has yielded to the officer's show of authority or been physically forced to yield.

■ Second, this decision and the decision of the Court of Appeals did not impair appellant's ability to claim constitutional protection under Art. I, § 9 by its decision that he was not seized until he yielded to the show of authority. Nothing in either decision will abridge or hinder a defendant's right to contest the constitutionality of a seizure, whether it is an investigative detention or an arrest. He could still claim the officers lacked a reasonable suspicion to detain him for purposes of investigation, or probable cause to arrest him. The State would still need to have proven that before appellant was seized the arresting officers had a reasonable and articulate suspicion to investigate, and probable cause to arrest. The fact that appellant can not claim he was seized until he stopped running and threw down his gun and bag does not excuse any conduct by the arresting officers, or remove appellant from the protection of Art. I, § 9. Appellant's ground for review is overruled. The judgment of the Court of Appeals is affirmed.

OVERSTREET, MALONEY, and MEYERS, JJ., concur in the result.

BAIRD, Judge, concurring.

Utilyzing the analytical framework of *Autran v. State*, 887 S.W.2d 31 (Tex.Cr.App. 1994), I agree that we should adopt the definition of seizure announced in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

### I.

*Autran* presented both a substantive and a procedural issue. The substantive issue was whether art. I, § 9 provided greater protection than the Fourth Amendment in the context of inventories. The procedural issue was what analytical framework should be employed when determining whether the Texas Constitution provides greater protection than the United States Constitution.

When we decided *Heitman v. State*, 815 S.W.2d 681 (Tex.Cr.App.1991), Judge McCormick dissented, criticizing the majority for adopting the doctrine of independent state grounds without an analytical framework for its application. *Id.* 815 S.W.2d at 691. The problems caused by the *Heitman* Court's failure to provide such a framework was dramatically seen in the Court of Appeals' opinion in *Autran. Autran v. State*, 830 S.W.2d 807 (Tex.App.—Beaumont 1992). In that case, each of the three justices wrote separately, expressing their frustration in attempting to interpret the Texas Constitution without some guidance from this Court. The frustration was most forcefully stated by Chief Justice Walker:

> By adopting the doctrine of 'independent state grounds,' without directions, the fourteen courts of appeals have been parachuted into the Okefenokee Swamp, at night, without a compass.

*Id.*, 830 S.W.2d at 817.

Consequently, our opinion in *Autran* was written in part to establish an analytical framework to be employed by this Court and the courts of appeals when asked to determine whether the Texas Constitution provides greater protection than the United States Constitution. Specifically, we stated:

> ... To determine whether our Constitution provides greater protection than its federal counterpart, we find the following factors *helpful*, although *not* independently dispositive: (A) a textual examination of the constitutional provision; (B) the Framer's intent; (C) history and application of the constitutional provision; (D) comparable jurisprudence from other states; and, (E) the practical policy considerations.

*Id.* 887 S.W.2d at 37 (emphasis added).[1] These factors have been frequently cited for consideration when conducting an independent state constitutional analysis. *Ibid.* n. 6

---

1. Notably, the dissent in *Autran* employed the same analytical framework to conclude art. I, § 9 did not provide greater protection in the context of inventories.

(citing Catherine Greene Burnett and Neil Colman McCabe, *A Compass in the Swamp: A Guide to Tactics in State Constitutional Law Challenges*, 25 Tex.Tech L.Rev. 75, 79–104 (1993)).[2] And today, the plurality employs the following *Autran* factors in its analysis: a textual examination of the constitutional provision, *ante*, 912 S.W.2d at 232; the Framer's intent, *ante*, 912 S.W.2d at 233–234; history and application of the constitutional provision, *ante*, 912 S.W.2d at 232–233; and, the practical policy considerations behind the constitutional provision, *ante*, 912 S.W.2d at 230, 235. Thus, the plurality employs *Autran*'s analytical framework.

## II.

In dissent, Judge Clinton attacks the plurality's independent constitutional analysis, stating the Court "all but abdicates its role—its only role as a discretionary review court—as 'the caretaker of Texas law.'" *Post*, 912 S.W.2d at 237–238 (quoting *Arcila v. State*, 834 S.W.2d 357 (Tex.Cr.App.1992)). Such criticism seems rather odd coming from the author of *Crittenden v. State*, 899 S.W.2d 668 (Tex.Cr.App.1995). In *Crittenden*, a majority of this Court ignored the considerations the dissent pleads for today, and adopted the Fifth Circuit Court of Appeals' "objective approach" to pretextual arrests simply on the basis of "judicial convenience." *Id.*, 899 S.W.2d at 673 (Baird, J., dissenting). Thus, the dissent's desire to "review the critical response of legal scholars, ascertain what judges in other jurisdictions have said … and then, ultimately, follow our own lights," *Post*, 912 S.W.2d at 240, is diametrically opposed to this Court's position in *Crittenden*.[3]

2. It is important to note the Supreme Court considered several of these factors in deciding *Hodari D.*, namely, the common sense definition of "seized," the historical approaches taken by the courts, several scholarly articles and public policy considerations.

3. In truth, the dissent is less of an evaluation of the factors critical to independent constitutional analysis and more of a generalized attack on *Hodari D.*

## III.

After considering the *Autran* factors, I conclude we should adopt for art. I, § 9 purposes, the definition of seized utilized by the Supreme Court when resolving alleged violations of the Fourth Amendment. That is, a seizure occurs when a person is physically forced to yield or a reasonable person would believe he is not free to leave and yields to a show of authority. *Hodari D.*, 499 U.S. at 624–29, 111 S.Ct. at 1550–52. *See also, Florida v. Bostick*, 501 U.S. 429, 433–35, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Under this definition, appellant was not seized.

With these comments, I join only the judgment of the Court.

CLINTON, Judge, dissenting.

The plurality devotes precious little of its attention to the real issue in this cause, concluding almost in passing that we will follow Fourth Amendment precedent in construing our own constitutional protection against unreasonable search and seizure. The plurality opinion reflects almost no understanding of the complexity and difficulty of the specific question before us. The only reason the plurality gives for adopting Supreme Court precedent is shallow and, ultimately, indefensible. No attempt is made to examine alternative views of scholarly commentators or opinions of appellate courts in other jurisdictions that have squarely faced the difficult but momentous question of how best to interpret their own Fourth Amendment analogs. Today the Court all but abdicates its role—its only role as a discretionary review court—as "the caretaker of Texas law[.]" *Arcila v. State*, 834 S.W.2d 357, 360 (Tex.Cr.App.1992). I dissent.

Judge Clinton takes exception to my stating his dissent is "diametrically opposed" to the position he took in *Crittenden*. *Post* at n.*. My observation is borne out by a reading of those opinions and my description is tame when one considers that Judge Clinton accused six members of this Court of being "intellectually dishonest." *See, Cook v. State*, 902 S.W.2d 471, 480 (Tex.Cr.App. 1995) (Clinton, J., concurring). Judge Clinton can not have his cake and eat it too. I think he protests too much.

## I.

The issue in this cause is the meaning and scope of a "seizure," which, if it is "unreasonable," will violate Article I, § 9 of the Texas Constitution. In short, was appellant "seized" in contemplation of our state constitutional provision? It has been decided below, and we have not granted review of the question, that appellant was not "seized" for purposes of the Fourth Amendment to the United States Constitution—at least as that provision was authoritatively construed by the United States Supreme Court in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). When it comes to our interpretation of Article I, § 9, decisions of the Supreme Court construing the Fourth Amendment are certainly persuasive, but just as certainly not binding, authority. *Heitman v. State*, 815 S.W.2d 681, 690, n. 22 (Tex.Cr.App.1991); *Richardson v. State*, 865 S.W.2d 944, 948 (Tex.Cr.App.1993). It is only fitting that we should consult the decision in *Hodari D.* for guidance. That we are in no wise constrained to follow any Fourth Amendment precedent in construing our own state constitutional analog, however, bears no rehearsal. At least since *Heitman*, it is a truism.

Nevertheless, today the plurality expends the greater part of its effort in a misguided discourse about whether and under what circumstances this Court should "diverg[e] from the path chosen by the Supreme Court" in issues of search and seizure. Op. at 233. The plurality seems to think that when *Heitman* recognized our obligation independently to construe Article I, § 9, it meant we are obligated to find a construction of that provision that differs from the Fourth Amendment analog. Op. at 233, n. 6. Our recent opinion in *Crittenden v. State*, 899 S.W.2d 668 (Tex.Cr.App.1995) should have established beyond peradventure that this Court "will not read Article I, § 9 differently than the Fourth Amendment in a particular context simply because we *can*." *Id.*, at 673, n. 8. But no one on the Court should doubt by now *that we can*. Indeed, we are duty bound to interpret our state constitution independently from Supreme Court interpretation of federal analogs. We have no choice. The Supreme Court has no authority to interpret the Texas Constitution for us. Even if we find the federal example persuasive, and adopt it as our own, it is still this Court that construes Article I, § 9. Moreover, we do not "diverge" from Supreme Court precedent on those occasions when we choose not to follow its interpretation of the Fourth Amendment in construing our own Article I, § 9. We simply "follow our own lights," as is our exclusive prerogative. *Eisenhauer v. State*, 754 S.W.2d 159, 167 (Tex.Cr.App.1988) (Clinton, J., dissenting), citing *Olson v. State*, 484 S.W.2d 756, 762 (Tex.Cr.App.1969) (Opinion on rehearing). Whether we interpret it differently or not, we cannot avoid *independently* construing Article I, § 9.

When the plurality finally does come to decide whether we should construe "seizure" under Article I, § 9 in the same way the Supreme Court did for purposes of the Fourth Amendment in *Hodari D.*, it devotes less than two pages to the analysis. In the end the plurality decides in fact that we should adopt the Supreme Court's interpretation of "seizure." That is to say, we should hold that it takes both a show of authority *and* a submission to that show of authority before it can be said that a seizure has occurred. The reason is singular and simple, *viz*: that we have a public policy in Texas, as evidenced by V.T.C.A. Penal Code, § 38.04, to encourage submission to police authority. Interpreting Article I, § 9 in line with the holding in *Hodari D.* will facilitate that public policy.

There are at least three significant problems with this reasoning. First, it is not at all clear that Texas has a policy to encourage submission to *unlawful* police authority, at least not if § 38.04 is the only indication. It is an offense under § 38.04 for a person to flee from a peace officer whom he knows is trying to arrest or detain him. Subsection (b) of that provision makes it an exception to the offense that the police authority purporting to make the arrest or detention has no lawful basis to do so. In her opinion for the court of appeals, Justice Lagarde noted this exception (unlike today's plurality), but explained that § 38.04 nevertheless "supports a policy of yielding to a police show of authority, whether or not lawful, and challenging the

lawfulness of the seizure in court." *Johnson v. State,* 864 S.W.2d 708, 723 (Tex.App.— Dallas 1993). She did not explain, however, how a suspect on the street who chooses to submit to unlawful police authority will be able to challenge the lawfulness of that authority, since presumably, having submitted, he will not be charged with evading arrest or detention under the statute at all! Indeed, if anything, the exception to § 38.04 would seem to encourage a suspect to resist an unlawful show of authority. This is true because, if the show of authority is unlawful, the suspect may be confident he can either: 1) successfully escape; or 2) in the event he should try to escape but fail, successfully challenge the seizure later in a court of law; or even 3) *both* successfully escape *and,* should he later be apprehended and charged with evading arrest or detention, successfully defend that charge in court. *If* indeed Texas has a policy to encourage submission to *unlawful* authority, § 38.04 is no proof.

Second, even if Texas has such a public policy, it strikes me as highly unlikely that interpreting "seizure" under Article I, § 9 to require a submission to a police show of authority will serve that policy. In *Hodari D.* itself, the Supreme Court observed that "policemen do not command 'Stop!' expecting to be ignored, or give chase hoping to be outrun[.]" 499 U.S. at 627, 111 S.Ct. at 1551, 113 L.Ed.2d at 698. Similarly I should think that a suspect who is bold enough to flee from a police show of authority, whether lawful or not, does not expect—certainly does not hope—to be caught. Since he does not expect to be "seized" by *any* definition, it is unlikely that our circumscribing the constitutional meaning of the word, even assuming he knew about it, would have any bearing on his decision whether to run. As Professor LaFave has observed: "Conferring upon the police unfettered discretion to commence chases hardly seems likely to reduce the willingness of or the · occasions on which members of the public would seek to elude the police." 3 W. LaFave, Search and Seizure § 9.2A(d) (Supple.1995) at 143.

Finally, it is odd that the plurality would choose to interpret a constitutional provision manifestly designed to protect the individual from undue encroachment by the state according to the dictates of a so-called public policy that unequivocally elevates the exigencies of the state over the interests of the individual. Not even the Supreme Court really did this, in *Hodari D..* It would be more accurate to say that the Supreme Court observed that as an incidental by-product of its construction of the word "seizure," "compliance with police orders to stop [would] be encouraged." 499 U.S. at 627, 111 S.Ct. at 1551, 113 L.Ed.2d at 698. Their construction of the word did not turn on the fact that they believed it would have this incidental effect. Nevertheless, to encourage uncritical submission to police authority is the sole reason today's plurality gives to prefer the *Hodari D.* construction. Thus the plurality draws the boundary of an imperative individual right exclusively according to a "public policy" that serves only the collective from which the individual requires protection in the first place. It does not even attempt to perform the ubiquitous "balancing" of the interests of the individual against those of the collective. This is a stunningly new, downright Orwellian, theory of constitutional interpretation!

## II.

In *Hodari D.* the Supreme Court held for the first time that, absent an actual physical restraint of the person, an individual is not "seized" for purposes of the Fourth Amendment by a police show of authority unless he actually submits. In other words, a fleeing suspect is not a "seized" suspect, and any contraband he discards during flight is not deemed the fruit of police illegality, subject to the Fourth Amendment exclusionary rule. The issue in this cause is whether "seizure" under Article I, § 9 also requires submission to a police show of authority. If so, then contraband discarded by a fleeing suspect will not be subject to our statutory exclusionary rule embodied in Article 38.23, V.A.C.C.P. Students of the Fourth Amendment almost invariably consider *Hodari D.* to represent a radical departure from the trend of Supreme Court jurisprudence defining the scope of a "seizure." In independently construing Article I, § 9, we must decide whether to emulate the *Hodari D.* departure, or to stay the course of earlier Supreme Court

cases, which we have shown every indication of following up until now. In reaching a decision, we should scrutinize the methodology and reasoning of the Supreme Court in *Hodari D.* itself, review the critical response of legal scholars, ascertain what judges in other jurisdictions have said when called upon to adopt or reject the *Hodari D.* example, and then, ultimately, "follow our own lights." See *Richardson v. State,* supra, at 948–951. To that endeavor I now turn.

### Hodari D.

The issue presented in *Hodari D.* was basically whether police pursuit of a suspect who flees upon their mere approach represents a "seizure" under the Fourth Amendment. It was apparently anticipated that the Supreme Court would decide whether such pursuit met the then-extant objective test for determining whether an individual has been seized for Fourth Amendment purposes that was first articulated in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Plurality Opinion). There the Supreme Court "conclude[d] that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.,* 446 U.S. at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. The *Mendenhall* test was later adopted by a majority of the Supreme Court, and was by all appearances the apotheosis of Fourth Amendment "seizure" analysis. See *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (Plurality Opinion); *I.N.S. v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

Appearances can be deceiving. Instead of applying a straightforward *Mendenhall* approach, the Supreme Court added another layer to the analysis. In essence the Court held that, in the absence of actual physical contact, it is not enough to effectuate a Fourth Amendment "seizure" that police have made a show of authority such that "a reasonable person would have believed that he was not free to leave." There must also be a submission to that show of authority before it may be said that a "seizure" has occurred. In short, there is no "seizure," in Justice Scalia's words, if "the subject does not yield." *Hodari D.,* supra, 499 U.S. at 626, 111 S.Ct. at 1550, 113 L.Ed.2d at 697.

Justice Scalia based his holding on the meaning of "seizure" in the common law, noting that by that understanding, a person or thing was not "seized" until "actually [brought] within physical control." *Id.,* 499 U.S. at 624, 111 S.Ct. at 1550, 113 L.Ed.2d at 696. He was unperturbed by the fact that an *attempted* seizure was also unlawful at common law, since common law "made many things unlawful, very few of which were elevated to constitutional proscriptions." *Id.,* 499 U.S. at 626, n. 2, 111 S.Ct. at 1550, n. 2, 113 L.Ed.2d at 697, n. 2. He then turned to the plain meaning of the word "seizure," concluding that "[i]t does not remotely apply ... to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure." To the dissenter's charge that this literal approach ignored the fact that the concept of "seizure" in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), was not grounded in the common-law, Scalia had a ready response. *Katz* unquestionably expanded upon the common law concept of the "seizure" of things, or *res,* holding as it did that a telephone conversation could be illegally "seized" under the Fourth Amendment. But it did not purport to reject the common law concept of "seizure" of the *person. Id.,* 499 U.S. at 627, n. 3, 111 S.Ct. at 1551, n. 3, 113 L.Ed.2d at 698, n. 3. *Terry* factually involved a submission to a show of authority, and was therefore in all things consistent with a literal constitutional interpretation of "seizure" of the person. *Id.* To *Hodari D.*'s argument that this new formulation of "seizure" was at odds with the *Mendenhall* articulation, Scalia replied:

> "In seeking to rely upon that test here, respondent fails to read it carefully. It says that a person has been seized 'only if,' not that he has been seized 'whenever'; it states a *necessary,* but not a *sufficient,* condition for seizure—or more precisely,

for a seizure effected through a 'show of authority.'"

*Id.*, 499 U.S. at 628, 111 S.Ct. at 1551, 113 L.Ed.2d at 698. Finally, Justice Scalia remarked that his approach was at least consistent with two prior Supreme Court opinions, one early and one late, *viz: Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), and *Brower v. Inyo County*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), respectively. *Id.*, 499 U.S. at 628–29, 111 S.Ct. at 1552, 113 L.Ed.2d at 699. Because *Hodari D.* had not complied with the police show of authority, the Supreme Court held he had not been illegally "seized" under the Fourth Amendment.

In dissent, Justice Stevens graphically illustrated the disturbing ramifications of the majority's holding when he observed "that a police officer may now fire his weapon at an innocent citizen and not implicate the Fourth Amendment—as long as he misses his target." *Id.*, 499 U.S. at 630, 111 S.Ct. at 1552, 113 L.Ed.2d at 699–700. This seeming anomaly he attributed to the majority's overly-parsing method of Fourth Amendment interpretation, a method once embraced by the Court in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), but since flat-rejected in cases such as *Katz* and *Terry.* *Id.*, 499 U.S. at 632–637, 111 S.Ct. at 1554–1556, 113 L.Ed.2d at 701–704. He argued that *Mendenhall* adequately framed a complete test for determining "seizure," at least as that word had come to be understood since *Katz* and *Terry, viz:* that a "seizure" has occurred *whenever* it may objectively be said (*Mendenhall* 's "only if" formulation notwithstanding) "that [a citizen's] liberty is being restrained in a significant way." *Id.*, 499 U.S. at 640, 111 S.Ct. at 1558, 113 L.Ed.2d at 706. The advantage of the *Mendenhall* test is its objectivity. It "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Id.*, 499 U.S. at 643–644, 111 S.Ct. at 1560, 113 L.Ed.2d at 708–709, citing *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 1980, 100 L.Ed.2d 565, 572 (1988). Under the majority's view, an officer must gauge whether he has "seized" an individual, not by his own conduct in approaching him, but by the individual's reaction to it.

But "the scope of the Fourth Amendment [should] not vary with the state of mind of the particular individual being approached." *Michigan v. Chesternut*, supra, 486 U.S. at 574, 108 S.Ct. at 1980, 100 L.Ed.2d at 572. The focus should be, rather, on the conduct of the officer. Otherwise, a lot of "coercive and intimidating" police behavior will "go unchecked." *Hodari D.*, supra, 499 U.S. at 645, 111 S.Ct. at 1561, 113 L.Ed.2d at 710. This runs contrary to the "[t]he deterrent purposes of the exclusionary rule" to "discourag[e] improper behavior" on the part of the police. *Id.*, 499 U.S. at 646, 111 S.Ct. at 1561, 113 L.Ed.2d at 710. Indeed, the majority's new rule may positively encourage police to engage in "unlawful displays of force that will frighten countless innocent citizens into surrendering whatever privacy rights they may still have." *Id.* Justice Stevens concluded: "A court more sensitive to the purposes of the Fourth Amendment would insist on greater rewards to society before decreeing the sacrifice it makes today." *Id.* 499 U.S. at 648, 111 S.Ct. at 1562, 113 L.Ed.2d at 711.

### The Critical and Judicial Response

The critical response to the Supreme Court's opinion in *Hodari D.* has been one of varying shades of condemnation. For the most part the scholars have echoed and amplified Justice Stevens' concerns. Perhaps the most adamant in his criticism is Professor LaFave. See *LaFave*, supra, at 139–145. LaFave argues forcefully that the majority opinion in *Hodari D.* erred· to split hairs between the common-law offenses of battery (a "seizure") and assault (not a "seizure"), agreeing with Justice Stevens that "this is not a dichotomy which 'should take on constitutional dimensions.'" *Id.*, at 141, quoting 499 U.S. at 631, 111 S.Ct. at 1553, 113 L.Ed.2d at 700 (Stevens, J., dissenting). To consult the common-law at all to define "seizure" is inconsistent with the Supreme Court's approach in *Katz v. United States*, supra. *Id.* LaFave accuses the *Hodari D.* majority of misrepresenting the true significance of case authority it cites as supportive (*viz: Brower* and *Hester* ), *id.*, at 141–142, and of ignoring those cases cited by the

dissent for their broader descriptions of the Fourth Amendment protection against unreasonable "seizure" in terms of "liberty," "freedom of movement," and "personal security." *Id.*, at 142.

LaFave also maintains that the Court is unrealistic to believe that requiring submission to authority will reduce the danger to the public inherent in police pursuits. Grounding the definition of "seizure" on the reaction of the citizen instead of the conduct of police is likely to encourage police to try to provoke him to flee, in the hope of generating evidence during the chase. To this extent the Court's ruling in *Hodari D.* actually enhances the risk that flight imposes upon the public. *Id.*, at 143–144. Finally, under *Hodari D.* it becomes less and less clear to the citizen that he really does have a right to walk away from a police encounter that is not supported by either probable cause or reasonable suspicion. This is so because as long as a citizen does not "submit," a police officer may follow him and continue to badger him until the citizen "consents" to do his will, without ever enjoying the protection of the Fourth Amendment, since arguably no "seizure" has occurred. *Id.*, at 145. LaFave believes that all of these anomalies stem from an excessively "literal-minded," common-law bound construction of the word "seizure."

Other commentators have raised similar concerns. See, e.g., T. Clancy, The Future of Fourth Amendment Seizure Analysis after *Hodari D.* and *Bostick*, 28 Am.Crim.L.Rev. 799 (1991) (*Hodari D.* is inconsistent with prior caselaw defining "seizure," misdirects focus upon citizen reaction rather than police conduct, and encourages police misconduct); Note, Fourth Amendment—Protection Against Unreasonable Seizure of the Person: The New(?) Common Law Arrest Test For Seizure, 82 J.Crim.L. & Criminology 747 (1992) (*Hodari D.* will encourage police misconduct); Note, A Conservative Court Says "Goodbye to All That" and Forges a New Order in the Law of Seizure—*California v. Hodari D.*, 52 La.L.Rev. 1321 (1992) (*Hodari D.* misplaces focus upon citizen reaction rather than police conduct); The Supreme Court—Leading Cases, 105 Harv.L.Rev. 177, 297 (1991) (*Hodari D.* confuses citizen re-

garding his right to avoid unwarranted police encounters); Note, Precedent for *Hodari* in Modern Supreme Court Cases—Does It Exist? An Analysis of *California v. Hodari*, 17 T.Marshall L.Rev. 171 (1991) (noting the anomaly of affording a more expansive constitutional definition of "seizure" to *res*, under *Katz*, than to *corpus*, under *Hodari D.*). Indeed, reasonably diligent research failed to uncover a single commentator who seemed to approve of the *Hodari D.* construction. In all fairness, it should be noted that several of the above commentators believed *Hodari D.* to be inconsistent, not so much with the language of the Fourth Amendment itself, as with the deterrent policy of the exclusionary rule by which Fourth Amendment rights are vouchsafed. See *A Conservative Court Says "Goodbye to All That"*, supra, at 1342–43; *Precedent For Hodari in Modern Supreme Court Cases*, supra, at 182. See also *California v. Hodari D.*, supra, 499 U.S. at 646, 111 S.Ct. at 1561, 113 L.Ed.2d at 710 (Stevens, J., dissenting). We do well to remember that whether rights protected by the Fourth Amendment have been violated is distinct from the question whether the federal exclusionary rule ought to apply. *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677, 688 (1984).

The judicial response has been no warmer. It appears that so far every state court of last resort to address whether to embrace *Hodari D.* for purposes of its own state constitutional analog has declined to do so. See *State v. Oquendo*, 223 Conn. 635, 613 A.2d 1300 (Conn.1992); *State v. Quino*, 74 Haw. 161, 840 P.2d 358 (1992); *Matter of Welfare of E.D.J.*, 502 N.W.2d 779 (Minn. 1993); *State v. Tucker*, 626 So.2d 707 (La. 1993). Cf. *People v. Holmes*, 81 N.Y.2d 1056, 601 N.Y.S.2d 459, 619 N.E.2d 396 (N.Y.1993) (holding that police pursuit must be predicated upon reasonable suspicion, apparently as a matter of state law, without reference to *Hodari D.*). It cannot be said that any of these opinions provides a particularly extended exegesis of the merits or demerits of the Supreme Court's "seizure" analysis. It is at least clear, however, that our sister states are in relative harmony in believing that the Fourth Amendment construction is insufficiently broad to protect the rights of their citizens to be "left alone." See *State v. Tuck-*

*er,* supra, at 711. The weight of authority is squarely against *Hodari D..*

### *"Our Own Lights"*

Given this background, how should we go about our independent obligation to construe "seizure" under Article I, § 9? Perhaps it is best to begin with a disclaimer. It will not do to say that we should interpret "seizure" broadly under Article I, § 9 because such a construction is in keeping with the deterrent policy of the exclusionary rule, as some have suggested. See *ante* at 242. Whether a "seizure" has occurred, and whether resulting evidence should be excluded if it has, are separate questions. *United States v. Leon,* supra. We cannot rightly decide that police conduct constitutes a "seizure" just because it seems egregious enough that we think any evidence obtained thereby ought to be excluded. That would allow the exclusionary tail to wag the "seizure" dog. In any event, we do not have a constitutional exclusionary rule in Texas. See *Brown v. State,* 657 S.W.2d 797, 803–804 (Tex.Cr.App.1983) (Clinton, J., concurring, on remand from United States Supreme Court), citing and quoting *Welchek v. State,* 93 Tex.Cr.R. 271, 247 S.W. 524 (1922). Whether or not we agree with the Supreme Court that, absent physical contact, a "seizure" requires submission to a show of authority must be gleaned from the text of Article I, § 9 itself.

Ultimately the issue boils down to choosing a methodology of constitutional interpretation. Shall we follow the Supreme Court's newly-revived literal-minded approach in construing our own search and seizure provision? Or shall we retain the former, more expansive *Mendenhall* approach, with which we were perfectly satisfied, at least as a matter of Fourth Amendment law, right up until *Hodari D.* was decided? E.g., *Daniels v. State,* 718 S.W.2d 702 (Tex.Cr.App.1986); *Holladay v. State,* 805 S.W.2d 464 (Tex.Cr. App.1991). In my view the latter methodology is preferable. As it currently stands, the Supreme Court has adopted a narrow (and dubious) understanding of "seizure" of the person, tethered to the common-law. At the same time it continues to entertain an understanding of "seizure" in other contexts that is not tied to the common-law at all. *Katz v. United States,* supra. Why would this Court want to give "more protection to people's interest in their items than to people's interest in their persons?" *Precedent For Hodari in Modern Supreme Court Cases,* supra, at 178. And yet, surely this Court is not prepared to abandon the methodology of *Katz* ! Having stayed the course of a reasonably liberal construction of Article I, § 9 so far—a course that is at least as solicitous of the inviolability of the individual as it is of the exigencies of the state—we should not deviate from it now.

Once we opt for a reasonably liberal construction of Article I, § 9, the criticisms of the *Hodari D*—tractors seem compelling enough. First, to require submission to a show of police authority before it may be said a "seizure" has occurred shifts the scrutiny from the conduct of the police—the state's representative—to the reflex of the individual, whom Article I, § 9 is supposed to be protecting in the first place. It thus fails to make inquiry into the character of state-sponsored conduct. The *Mendenhall* test, by contrast, is a measure of the level of pressure the police bring to bear, and thus focuses on police behavior. If a reasonable person would not feel free to leave under the circumstances, then even the suspect who runs is under a weight of mental, if not actual physical, coercion. And if a communication can be "seized," under *Katz v. United States,* supra, can we really say that a "seizure" cannot be communicated? Second, notwithstanding Justice Scalia's naive optimism, delaying the moment of "seizure" until actual submission to a show of authority occurs will likely encourage police to provoke flight as a way of producing evidence. This only promotes police intimidation, without any countervailing reduction of risk to the public. Thus the "public policy" espoused by *Hodari D.,* and eagerly, albeit uncritically, endorsed by a majority of this Court today, is a sham.

For these reasons we should adhere to the *Mendenhall* test for determining under Article I, § 9 whether, absent physical restraint, a "seizure" has taken place. We should do so, not because exclusionary policy seems to call for it—we have no constitutional exclusionary policy under Article I, § 9. We should do so because to construe "seizure" in this way strikes an appropriate balance between the individual's right to be free of

unwarranted governmental intrusion and the state's often-legitimate need to intrude in order to prevent or vindicate crime and thereby protect its citizenry.

### III.

I agree, of course, with Justice Lagarde's observation below that we should not interpret Article I, § 9 more protectively than the Fourth Amendment just because we *can. Johnson v. State,* supra, at 718. See *Crittenden v. State,* supra. In this instance, however, as in *Richardson v. State,* supra, I believe we *should* construe Article I, § 9 more protectively.* I would hold that an individual is "seized" under Article I, § 9 *whenever* a reasonable person in his circumstances would not feel free to leave, whether he tries to leave anyway or *not.* I would then remand the cause to the court of appeals for further proceedings not inconsistent with that holding.

Because the Court does not, I dissent.

* In his motion for rehearing, which we have denied this day, appellant complains that our original opinion, which we withdraw this day, devoted unjustifiable attention to collateral matters, including "the individual judges' opinions of each other." In an effort to tone down the rhetoric, we have issued these substitute opinions today. I can only hope the effort succeeds. The concurring opinion continues to insist, however, that my position in the present cause is "diametrically opposed to" the opinion I wrote for the Court in *Crittenden v. State,* 899 S.W.2d 668 (Tex.Cr.App.1995). In the further interest of collegiality, I will forbear response any more than simply to refer the reader to the explanatory text and footnote in *Crittenden,* supra, at 673 & n. 8.