# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00202-CR

**Brian Ronald Jeffrey, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. 0991361, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

A jury found Brian Ronald Jeffrey guilty of capital murder. *See* Tex. Pen. Code Ann. § 19.03(a)(2) (West 1994). The jury found that there were sufficient mitigating circumstances to warrant punishment of life imprisonment rather than death. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e)(i) (West Supp. 2002). The trial court sentenced appellant to life imprisonment. *See id*. § 2(g). On appeal, appellant asserts that evidence obtained as a result of his unlawful detention and arrest was erroneously admitted. We will affirm the judgment.

## Facts

On the night of January 18, 1999, Officer Scott Perry, a 7-year veteran of the Austin Police Department, working alone in uniform and driving a marked patrol car, was on routine patrol in Southwest Austin. At 10:52 p.m., Officer Perry turned into an alley that ran between Wilson Street and Congress Avenue and behind Trophy's Bar, a local hangout frequented by drug dealers and

prostitutes. The alley was poorly lit. Prior to that evening, Officer Perry had made "numerous drug arrests and drug paraphernalia arrests" in the alley. Also, he was aware that other officers had previously made arrests there for "drug offenses, stolen cars, paraphernalia offenses, prostitution, just a wide, wide array of offenses."

As Officer Perry drove slowly through the alley traveling eastbound toward Congress, he saw "two subjects just kind of standing looking at [his] car and turn and start walking the other direction." As he proceeded through the alley, the two men continued walking. However, when Officer Perry reached the area where he had originally seen the two men, they suddenly stopped, turned around, and began walking toward him. Because he wanted to find out why the two men had turned around and begun to approach him and because he did not want to be "stuck in [the] car," Officer Perry immediately stopped and exited his patrol car.

As the two men approached, Officer Perry met them in front of his patrol car, where he asked them, "Hey, what's going on? What are you doing?" The officer noticed that the older of the two subjects, whom he later identified as appellant, Brian Jeffrey, had a large tattoo on the side of his neck. The younger subject, later identified as Michael Fletcher, appeared to be around seventeen or eighteen years of age. Appellant did most of the talking.

Appellant initially told Officer Perry that he and his companion were going to a friend's house on Congress. Because the men had turned around when they saw the patrol car and had begun walking westbound—away from Congress—the officer asked them why, if his friend lived on Congress, they were walking away from Congress. Appellant responded that they were not quite sure where the friend lived but that they just knew that it was around Congress somewhere. When

2

Officer Perry continued to ask the two men where their friend lived and how far it was from their present location, appellant said that he did not know where the friend lived, prompting Officer Perry to ask them where they lived. Using his shoulder radio microphone, Officer Perry then notified the dispatcher that he was "out on some subjects" and that he needed someone to check on him.

While waiting for a backup officer to arrive, Officer Perry continued his conversation with the two men. As he did so, he noticed what appeared to be fresh blood on appellant's blue "warm-up style" pants. By that point, Officer Perry had developed suspicions that the two men had been involved in some kind of criminal activity. He then asked the men if he could frisk them to make sure they did not have any weapons on them. Both men consented and placed their hands on their heads. Officer Perry did not find a weapon on either man but noticed, while frisking appellant, that appellant's heart was "pounding incredibly hard." This further heightened the officer's suspicions that the men had been involved in some sort of criminal activity.

Officer Perry then asked the two men for their names and identification. Appellant, Brian Jeffrey, told Officer Perry that his name was "Keith Dominguez" and that he had an inmate ID but that his wallet and ID had been lost or stolen a few days earlier. Appellant also told the officer that he had been in prison for burglary of a habitation. The younger man, Michael Fletcher, told Officer Perry that his name was "James Farele." Both men wore blue clothing and the younger man displayed a tattoo that read "IGC," an acronym known by Officer Perry to refer to a criminal street gang known as the "Insane Gangster Crips." Both men admitted at that time that they were Crips.

As Officer Perry was questioning the two men, Officer Robert Hawkins arrived. While Officer Hawkins stood with the two men, Officer Perry returned to his patrol car to verify the

3

men's identities and to check them for warrants. He did so by entering the names and dates of birth they had given him into the vehicle's mobile data terminal ("MDT"). Officer Perry's search failed to confirm the identity of either individual, despite the fact that appellant had said that he had previously served time in prison.

As Officer Perry was searching his MDT database, Officer Hawkins noticed that appellant appeared somewhat nervous. Appellant was shaking slightly, leaning forward, and rocking forward on the balls of his feet. Believing that appellant was preparing to flee, Officer Hawkins signaled to Officer Perry. Officer Perry then noticed that appellant was shifting from foot to foot and looking around. To prevent appellant from fleeing, Officer Perry stepped out of his patrol car, approached the two men again, and questioned the men further about their origin and destination. Appellant then changed his explanation, stating that he was going to his brother-in-law's apartment, not to his friend's apartment as he had originally stated. In response to further questioning, appellant stated that his brother-in-law lived in the Courtyard Apartments. Because the alley where the men were standing was situated directly behind the Courtyard Apartments, that response further aroused Officer Perry's suspicions.

Due to a combination of factors, including the fact that there was blood on appellant's pants, the fact that he believed that both men had given fictitious names, and the fact that the appellant had given contradictory explanations concerning the men's origin and destination, Officer Perry asked the men if they would consent to a search of their pockets. After both men consented, Officer Perry searched Michael Fletcher and Officer Hawkins searched the appellant. As Officer Hawkins searched the appellant, he noticed blood smeared on the appellant's lower right pants leg

4

and droplets of blood on the toe of his right shoe. During his search of the appellant's companion, Officer Perry found a wallet. When Officer Perry opened the wallet and began to look inside it, appellant said, "That's my wallet." When Officer Perry reminded him that he had previously said that he had lost his wallet, appellant attempted to reconcile the two statements by saying that the wallet held by Officer Perry was a new one. Officer Perry examined the papers inside the wallet, however, and noticed that they were old, worn, and tattered. This created even greater suspicion in the officer's mind.

Both officers then began asking the two men about the blood on the appellant's pants. As they inspected appellant more closely, they observed blood on the top and the sides of his white tennis shoes. They also saw a large amount of blood on the inside of appellant's forearm, prompting Officer Perry to remark, "Man, you are covered in blood." When the officers continued to question appellant about the blood, he told them that he thought it got on his shoe when he kicked a transient in the mouth after the transient had jumped him earlier in the evening. At that point, neither suspect had been handcuffed. Officer Hawkins was suspicious of appellant's explanation because it was not consistent with his observations of appellant's clothing. As a result, both officers decided to take some Polaroid photographs of the men. As Officer Perry was preparing to photograph the two men, Officer Hawkins, "in an effort to lighten the mood a little bit," made a sarcastic comment to the effect that the officers wanted the photographs in case the transient turned up dead. Upon hearing Officer Hawkins' remark, appellant looked at him with a very serious look on his face and said, "I didn't set out to kill anyone tonight."

5

Officer Perry then returned to his patrol car to check his MDT and to ask the police teletype operator to check the database for prior involvement on both suspects. Finding no involvement of either suspect, Officer Perry sensed that something was wrong. He got out, walked around his car, and, with the aid of his flashlight, examined the surrounding area. Lying near the car's right rear tire was a body wrapped in a green blanket with blood on it. At that point, approximately twenty minutes after initially encountering the suspects, Officer Perry returned to the front of his patrol car and told appellant that he needed to sit in the back seat of the patrol car until they could figure out what was going on. Appellant responded by saying "I didn't kill anybody" or "I didn't kill anyone tonight." Officer Perry then handcuffed appellant and placed him in the back seat of his patrol car. Shortly thereafter, Officer Hawkins handcuffed Michael Fletcher and placed him in the back of Hawkin's patrol car.

After the two suspects were transported to headquarters, Detective Tracy Gerrish determined the true names of the suspects and learned of the existence of a local traffic warrant for the arrest of appellant. That warrant was later confirmed. A certified copy of the traffic warrant was admitted into evidence at the pretrial hearing.

At 1:42 a.m., Detective Gerrish, Sergeant Kenneth Cavett, and Crime Scene Technician Jerry Valdez entered the interview room where appellant had been placed. Their immediate purpose was to examine appellant for blood and to collect his clothing as evidence. At 1:48 a.m., while Detective Gerrish was out of the room, the following colloquy took place between appellant and Sergeant Cavett:

Appellant:    Are we being charged with something?

6

Sgt. Cavett:    I don't know right now.

Appellant:      If I'm not being charged with anything, how come I have to turn in all of my clothes?

Sgt. Cavett:    Well, you're under arrest.

Appellant:      For what?

Sgt. Cavett:    But you're just not being charged with anything yet . . . I don't know when you will be.

Appellant:      Damn!  I didn't think walking through an alleyway was a crime.

Appellant:      So how soon before I know I'm being charged with something?

Sgt. Cavett:    It's gonna be a couple of hours.

Appellant:      **When can I get a lawyer?**  [Emphasis added.]

Sgt. Cavett:    As soon as you get to a phone . . . [unintelligible] . . . when we get to a phone . . . .  We'll give you a phone.

Appellant:      So, when are y'all going to read me my rights?

Sgt. Cavett:    Uh, it'll be just a minute.  As soon as somebody comes in to talk to you, they'll do that.

Later that morning, at 6:41 a.m.—approximately five hours later—detectives began an electronically recorded interview of appellant.  Prior to any questioning, appellant was given his *Miranda* warnings.  Asked whether he understood those rights, appellant nodded his head.  Detective Gerrish told appellant three times that he did not have to talk to the police.  When asked to make the decision, appellant stated, "Yes, I want to talk."  Detective Gerrish then asked, "So you're waiving your right to an attorney and you want to get your side of the story out?"  Appellant then answered

7

affirmatively by nodding his head up and down. Appellant then gave a voluntary oral statement that was simultaneously entered into a laptop computer. At 9:25 a.m., appellant signed a computer-generated copy of the statement in the presence of two civilian witnesses.

### Detention and Arrest

In his first point of error, appellant argues that the "trial court erred in admitting evidence obtained as a result of the illegal detention and arrest of appellant." Appellant claims that all of the evidence connecting him with the crime was obtained as a result of his unlawful detention. Specifically, appellant says that evidence there was blood on his clothing and body, his oral and written statements, and the warrant to search his body were all fruits of an unlawful detention and should have been suppressed.

Not every encounter between an individual and a police officer is of constitutional dimension; a police officer may approach an individual without probable cause or reasonable suspicion to ask questions or even to request a search. *See California v. Hodari D.*, 499 U.S. 621, 628 (1991); *Florida v. Royer*, 460 U.S. 491, 497-98 (1983); *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995); *Horton v. State*, 16 S.W.3d 848, 851 (Tex. App.—Austin 2000, no pet.). So long as the individual to whom the officer puts the questions remains free to disregard the questions and walk away, there is no detention and no intrusion upon the individual's liberty or right of privacy implicating the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Hawkins v. State*, 758 S.W.2d 255, 259 (Tex. Crim. App. 1988). Asking for identification and permission to search a person does not automatically mean that detention has occurred. *See*

8

*Florida v. Bostick*, 501 U.S. 429, 435 (1991); *Hunter v. State*, 955 S.W.2d 102, 105 (Tex. Crim. App. 1997).

Appellant's and Officer Perry's initial encounter occurred late at night in a dark alley where Perry knew criminal activity was commonplace. When Perry first saw the two men in the lights of the patrol car, they looked surprised and walked on down the alley. They then started walking back toward Perry when he stopped where he had first observed them. In the ensuing conversation, appellant gave implausible and inconsistent explanations in accounting for the men's presence in the alley. Perry knew by the men's clothing, tattoos, and admissions that they were both members of the Insane Gangster Crips, a street gang whose members often engaged in criminal activities. Most importantly, Perry observed fresh blood on appellant's trousers. Perry only engaged the men in conversation and made no show of force or authority. To that point, this encounter can only be characterized as consensual, raising no Fourth Amendment concerns.

When Perry asked for permission to frisk appellant and his companion, even though they consented, the situation arguably escalated into an investigative detention. The purpose of an investigative detention is to establish a person's identity or to maintain the status quo while an officer obtains more information. *See Comer v. State*, 754 S.W.2d 656, 657 (Tex. Crim. App. 1986). Probable cause is not required but reasonable suspicion is required to temporarily detain an individual. *See id.*; *Armstrong v. State*, 966 S.W.2d 150, 152 (Tex. App.—Austin 1998, no pet.).

"Reasonable suspicion" exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged in or is engaging in criminal activity. *See Garcia v. State*, 43 S.W.3d

9

527, 530 (Tex. Crim. App. 2001). The reasonable suspicion determination is made by considering the totality of the circumstances, *id*. Conducting the totality of the circumstances determination requires a bifurcated standard of review: (1) giving almost total deference to a trial court's determination of historical facts and application of the law to fact questions that turn on credibility and demeanor of the witnesses, and (2) reviewing *de novo* application of law to fact questions that do not turn upon credibility and demeanor, *id*.; *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When the trial court does not make explicit findings of historical fact, review of the evidence is made in the light most favorable to the trial court's ruling. *Carmouche v. State*, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000). Giving deference to the trial court's implicit finding of facts, we conclude *de novo* that these facts were sufficient to give rise to reasonable suspicion justifying an investigative detention of appellant.

During the investigative detention of appellant, additional facts developed rapidly, culminating in probable cause to arrest appellant. Probable cause to arrest exists when the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information would warrant a reasonably prudent man to believe that a particular person has committed or is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Henry v. United States*, 361 U.S. 98, 102 (1959); *Jones v. State*, 565 S.W.2d 934, 936 (Tex. Crim. App. 1978).

When Perry frisked appellant, he noticed that appellant's heart was "pounding incredibly hard." Appellant told Perry that his name was Keith Dominguez, that he had been in prison for burglary of a habitation, and that he had an inmate I.D. However, he said his I.D. was in his wallet which had been lost or stolen several days earlier. Appellant's companion, Michael Fletcher,

10

told Perry that his name was James Farele. At this time, Officer Hawkins arrived to assist Perry. Perry, using the computer in the patrol car, attempted to confirm the identity of the men being detained but he was unable to do so. It puzzled Perry that he could not confirm appellant's identity because appellant had admitted a prior felony conviction. This led Perry to believe the men had not given him their true names.[1] When Hawkins signaled Perry that he thought appellant might be getting ready to flee, Perry's suspicion was heightened and he asked the men if they would consent to a search of their pockets. They consented, and appellant claimed ownership of the wallet found in his companion's pocket. Appellant said he had obtained a new wallet. However, the "new" wallet contained old, worn and tattered papers. The officers observed more blood on appellant's trousers, on his shoes, and a large amount on his arm. Appellant claimed he got the blood on him earlier in the evening when he kicked a transient who had "jumped" him. The conversation continued and appellant, rather inexplicably, said "I didn't set out to kill anyone tonight." Officer Perry, again using his computer, tried to confirm the identity of the men detained. When he was unsuccessful, he became even more suspicious. With his flashlight, Perry began to inspect the area where he had first seen the men. Almost immediately, he found a body wrapped in a bloody blanket close to the place where he had first seen the men. Perry then told appellant he would have to get in the patrol car. Appellant said "I didn't kill anyone tonight." The men were handcuffed and taken to police headquarters.

---

[1] A person commits an offense if he intentionally gives a false or fictitious name, residence address, or date of birth to a peace officer who has lawfully detained that person. *See* Tex. Pen. Code Ann. § 38.02(b)(2) (West 1994). A person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to a peace officer conducting the investigation. *See id.* § 37.08(a)(1) (West Supp. 2002).

Giving deference to the trial court's implicit finding of facts and considering all of the facts and circumstances, we have applied the bifurcated standard of review and find *de novo* that there was probable cause for appellant's arrest. Soon after reaching police headquarters, officers determined appellant's true identity and found there was an unserved warrant authorizing appellant's arrest.

Evidence that there was fresh blood on appellant's clothing and body, his oral and written statements, and the warrant issued for seizure of his body fluids all resulted from appellant's lawful detention and arrest. Appellant's claim that this evidence was the fruit of his unlawful detention and arrest is without merit. Appellant's first point of error is overruled.

**Request for Counsel**

In his second point of error, appellant asserts that the trial court erred in admitting evidence obtained as a result of unlawful interrogation conducted after he had invoked his right to counsel. Appellant argues that his interrogation violated his Sixth and Fourteenth Amendment rights. Appellant does not mention his Fifth Amendment right as implemented by *Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966). The right to counsel provided by the Sixth Amendment attaches only after the initiation of adversarial criminal proceedings; a suspect in a criminal investigation has no Sixth Amendment right to the assistance of counsel. *See Davis v. United States*, 512 U.S. 452, 456-57 (1994); *United States v. Gouveia*, 467 U.S. 180, 188 (1984); *Kirby v. Illinois*, 406 U.S. 682, 689 (1967). Because no adversarial criminal proceedings had been initiated against appellant at the time he made an oral and a written statement, he had no Sixth Amendment right to counsel. *See Davis*, 512 U.S. at 456-57.

Even if appellant's claim had been based on his *Miranda* and statutory[2] rights, it would be without merit. The Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966), that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins. The right to counsel established in *Miranda* was one of a series of safeguards mandated that were not in themselves rights protected by the constitution but were instead measures to insure that the Fifth Amendment right against compulsory self-incrimination was protected. *Davis*, 512 U.S. at 457; *Michigan v. Tucker*, 417 U.S. 433, 443-44 (1974). Law enforcement officers must immediately cease questioning a suspect who clearly asserts his right to have counsel present during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477 (1981). "However, if the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis*, 512 U.S. at 461.

A mere reference to a lawyer or an ambiguous or equivocal reference to a lawyer before or during interrogation is not sufficient to invoke an accused's right to counsel. *See Davis*, 512 U.S. at 455-57 ("Maybe I should talk to a lawyer" insufficient); *Dinkins v. State*, 894 S.W.2d 330, 350-52 (Tex. Crim. App. 1995) ("Maybe I should talk to some one" insufficient); *Russell v. State*, 727 S.W.2d 573, 575-76 (Tex. Crim. App. 1987) (accused's question whether officers thought presence of an attorney necessary; insufficient); *Collins v. State*, 727 S.W.2d 565, 568 (Tex. Crim. App. 1987) (accused's inquiring whether he would get an attorney appointed when he got to Houston; insufficient); *see also Guidry v. State*, 9 S.W.3d 133, 143 (Tex. Crim. App. 1999);

---

[2] *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 2 (West 1979).

13

*Dewberry v. State*, 4 S.W.3d 735, 747 (Tex. Crim. App. 1999); *Ethridge v. State*, 903 S.W.2d 1, 17-18 (Tex. Crim. App. 1994).

In this case, after appellant's arrest and while he was in an interrogation room, but over five hours before he was interrogated, an officer came into the room, not to interrogate appellant, but to obtain appellant's bloody clothes. Appellant, in conversation with the officer, asked the officer, "When can I get a lawyer?" This question is the basis for appellant's claim that he requested counsel before he was interrogated. Immediately before he was interrogated and after he had been readvised of his *Miranda* rights, appellant said, "Yes, I want to talk" and affirmatively waived his right to counsel.

The evidence supports the trial court's implied finding that appellant did not unambiguously and unequivocally request counsel before or during his interrogation. Having considered the totality of the circumstances shown by the record and giving deference to the trial court's implied finding of facts, we conclude independently and *de novo* that appellant did not unambiguously and unequivocally ask for counsel before or during his interrogation. Appellant did not exercise his right to counsel. Appellant's second point of error is overruled.

The judgment is affirmed.

_____

14

Carl E. F. Dally, Justice

Before Chief Justice Aboussie, Justices Yeakel and Dally[*]

Affirmed

Filed:   April 18, 2002

Do Not Publish

---

[*]   Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).