# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00126-CR

**Frank Dickson, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE COUNTY COURT AT LAW NO. 5 OF TRAVIS COUNTY
CAUSE NO. 672396, HONORABLE NANCY WRIGHT HOHENGARTEN, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Frank Lacy Dickson, Jr. appeals the county court's judgment convicting him of operating a motor vehicle while intoxicated (DWI). *See* Tex. Penal Code Ann. § 49.04 (West 2003). Dickson filed a pretrial motion arguing that the evidence of his arrest and the subsequent Intoxilyzer test results should be suppressed because the length of his investigative detention was unreasonable and because the arresting officer's extra-statutory warnings rendered his consent to the taking of the breath sample involuntary. The county court denied Dickson's motion to suppress. We will affirm the court's judgment.

## BACKGROUND

While patrolling after midnight on June 26, 2004, Officer Roman Santos observed Dickson in a pickup truck exiting an apartment complex at an unusually high rate of speed. Santos

followed the truck and watched as Dickson made numerous lane changes without signaling, eventually swerving into an adjacent lane and nearly hitting another car.

Santos pulled Dickson's truck over on East Riverside Drive at 2:42 a.m. and made contact with Dickson. When Santos stated that Dickson looked familiar, Dickson replied by identifying himself as a Travis County assistant district attorney. Santos testified that this admission made him very uncomfortable. Shortly after making contact with Dickson, Santos determined that the stop would require additional investigation into whether Dickson was intoxicated, given his erratic driving and the strong odor of alcoholic beverages emanating from his breath and person. Santos testified that, despite his previous experience investigating DWIs, he felt it necessary to call his supervisor for advice because of Dickson's position. The supervisor told Santos to call a specialized DWI enforcement officer known as a "55 unit." Santos testified that it was routine practice to call in the "55 unit" to make sure that there is greater expertise at the scene and to eliminate the extra time that regular patrol officers would otherwise spend completing DWI investigations. Santos followed his supervisor's instructions and called DWI Officer Ryan Herring at 2:50 a.m.

Herring did not arrive at the scene for twenty minutes. Upon arriving, Herring spoke to Santos to confirm that the initial traffic stop had been lawful and then approached Dickson and began administering field sobriety tests. At the pretrial hearing, Herring testified that Dickson gave several evasive answers to his preliminary questions, at which point Herring decided to be frank with Dickson: he told Dickson that he would assume that Dickson knew why he was asking the questions that he was asking, and that Dickson knew what was going to happen following the field sobriety

2

tests—either he would be free to go or he would go to jail. Dickson stated that he understood, and Herring administered three field sobriety tests. Dickson failed two of the three tests, and Herring placed him under arrest.

Following the arrest, Herring placed Dickson in his car and administered the statutory DWI warnings before asking Dickson if he wanted to submit to an Intoxilyzer test. After hearing the warnings, Dickson asked if he would be released if he passed the Intoxilyzer test. Herring told him "no" because he was already under arrest and referred him to the statutory warnings regarding refusal to provide a breath sample. Before reaching the police station, Dickson again asked whether he would be let go. At the police station, Herring asked Dickson for the second time whether he would give a breath sample for Intoxilyzer testing. Dickson responded by asking if he would be arrested for not taking the Intoxilyzer test, and Herring replied that Dickson was already under arrest. Dickson then asked, "[S]o if I don't give a sample, then, I'm going to jail?" Officer Herring said, "[R]ight if you do give a sample, you may end up there also. Just the same fate. It's just up to you. Your answers are final answers. I'm not going to debate you back and forth." At that point, Dickson consented to give a breath sample. Dickson then repeated his inquiry as to whether he would be let go if he passed the Intoxilyzer test, and Herring responded that he had not said that. Dickson later resumed his questioning, asking whether he would be booked regardless of taking the test. Herring replied by stating that he could only refer Dickson back to the statutory warnings. Dickson then repeated his question, and Herring replied by stating that they would look at the results. While Herring and Dickson were inside the Intoxilyzer room performing the test, Dickson again asked if

3

he had a chance of being released if he passed the test, and Herring replied that he could not talk to him until after the results of the test were over. Dickson then asked if Herring had already made up his mind and if he could talk to him before the test was over. Herring replied that he did not want to give the impression that he was trying to lead Dickson one way or the other, and Dickson responded that he was not saying that Herring was attempting to do so. Dickson ultimately failed the Intoxilyzer test.

A pretrial hearing was held on Dickson's motion to suppress. After the motion was denied, the trial judge made the following oral findings of fact, on the record, at defense counsel's request: (1) that Officer Santos was "qualified to have done [the field sobriety] tests"; (2) that he called in the "55 unit" both because of his desire to have the investigation procedures followed precisely, given that he had stopped an assistant district attorney on suspicion of DWI, and because it was his routine practice to call in "55 units" to ensure greater expertise at the scene and to eliminate the time that the patrolling officer spends processing DWI investigations and arrests; and (3) that no extra-statutory warning was given to Dickson, and, therefore, there was no *Erdman* violation in this case.[1] *See Erdman v. State*, 861 S.W.2d 890, 894 (Tex. Crim. App. 1993). Dickson pleaded *nolo contendere*, and the trial court found him guilty based on his plea, assessing punishment at four days' confinement in the Travis County Jail, a ninety-day driver's license suspension, and a $750 fine. This appeal followed.

---

[1] In reviewing a motion to suppress, oral findings of fact can be considered as findings of fact on the record and given due deference. *See, e.g.*, *State v. Groves*, 837 S.W.2d 103, 106 n.5 (Tex. Crim. App. 1992).

**DISCUSSION**

Dickson raises two points of error. First, Dickson contends that the trial court erred in denying his motion to suppress because his investigative detention was unreasonable under the Fourth Amendment to the United States Constitution and article one, section nine of the Texas Constitution. Specifically, Dickson claims that the evidence presented showed that the police detained him longer than necessary and refused to use the least intrusive means available to dispel or confirm their suspicion that he was driving while intoxicated. Second, Dickson asserts that the trial court erred in denying his motion to suppress because Herring coerced him into submitting a breath sample by issuing extra-statutory warnings that rendered Dickson's consent involuntary.

**Standard of Review**

We review a trial court's ruling on a motion to suppress for an abuse of discretion and we review the record of the hearing on the motion in the light most favorable to the trial court's ruling. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). At the hearing on the motion, the trial court is the sole judge of the credibility of the witnesses and decides the weight to give their testimony. *Villarreal*, 935 S.W.2d at 138; *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). We must sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Villarreal*, 935 S.W.2d at 138; *see Romero*, 800 S.W.2d at 543.

**Unreasonable Detention**

In his first point of error, Dickson claims that his detention was unreasonable and that the trial judge erred in denying his motion to suppress the evidence obtained as a result of that detention. We disagree.

An investigative detention in which the subject is not free to leave is a seizure for purposes of the Fourth Amendment to the United States Constitution and article one, section nine of the Texas Constitution. *Johnson v. State*, 912 S.W.2d 227, 235-36 (Tex. Crim. App. 1995). Detentions during traffic stops constitute seizures and must be reasonable. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). The Supreme Court has adopted a dual inquiry for determining the reasonableness of an investigative detention: (1) whether the officer's action was justified at its inception and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). The court of criminal appeals has held that the standard for determining the reasonableness of an investigative detention is the same under the Texas Constitution as it is under the U.S. Constitution. *See, e.g.*, *Carmouche v. State*, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000) (applying *Terry* inquiry); *Davis v. State*, 947 S.W.2d 240, 242-44 (Tex. Crim. App. 1997) (holding that *Terry* applies in Texas); *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997) (finding no reason to employ different inquiry under Texas Constitution). A stop that was justified at its inception may become unreasonable if it does not satisfy the second part of the inquiry as to scope. *Davis*, 947 S.W.2d at 243. An investigative detention must be temporary and last no longer than necessary to effectuate the purposes of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Davis*, 947 S.W.2d at 245. The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Davis*, 947 S.W.2d at 245.

Because Dickson does not challenge on appeal whether Officer Santos's action in calling the DWI enforcement officer was justified at its inception, we are only concerned with whether the delay in waiting for the arrival of Herring was reasonably related in scope to the circumstances which justified the interference in the first place.

6

We have previously addressed the reasonableness of a delay caused by the investigative methods employed in an investigative detention in a case with facts similar to those presented here. *See Hartman v. State*, 144 S.W.3d 568, 573-74 (Tex. App.—Austin 2004, no pet.). In *Hartman*, an officer stopped a driver for speeding and developed a suspicion that the driver was intoxicated based upon his slurred speech and the strong odor of alcoholic beverages on his breath. *Id*. at 570. Although the officer was trained to perform the necessary field sobriety tests, he waited for five to fifteen minutes for another officer to arrive with a camcorder to tape the suspect performing the tests. *Id*. In determining that the delay and detention were reasonable, this Court pointed out that the "key inquiry is not whether a less intrusive alternative was available to law enforcement officials, but whether the police acted unreasonably in failing to choose that alternative." *Id*. at 574 (citing *United States v. Sharpe*, 470 U.S. 675, 687 (1985)). While brevity is a factor in determining the reasonableness of a detention, courts "have emphasized the need to consider the law enforcement purposes to be served by the stop, as well as the time reasonably needed to effectuate those purposes." *Id*. at 572 (quoting *Sharpe*, 470 U.S. at 685). The detention involved in *Hartman* was held to be reasonable because the delay involved was not dilatory and because it was necessary to effectuate an important law enforcement purpose—compliance with police department procedure. *Id*. at 574.

The detention involved in this case is not rendered unreasonable even if Santos called in Herring solely out of a desire to ensure that the investigation of an assistant district attorney on suspicion of DWI was done in strict compliance with investigatory procedures. Authorities must be allowed to graduate their responses to the demands of a particular situation. *Id*. (citing *United States v. Place*, 462 U.S. 696, 710 n.10 (1983)). Here, Santos could assume that Dickson had a particularly detailed knowledge of DWI law and that his arrest would be intensely scrutinized. Under these

7

circumstances, it was not unreasonable to institute a brief delay to summon a specialized DWI officer to conduct the investigation and provide a certain amount of confidence that procedures would be strictly followed. *See Kothe v. State*, 152 S.W.3d 54, 67 (Tex. Crim. App. 2004) (short detention in DWI stop to facilitate valid law enforcement purpose was not unreasonable detention given totality of circumstances). Indeed, Dickson's subsequent repeated questioning of Herring in what Herring described as an attempt to elicit a response that would help Dickson "down the line" seems to validate Santos's instinct to call Herring.

More importantly, the evidence established that the delay was not dilatory in nature but instead represented an average response time. Additionally, the trial court found that while Officer Santos was trained to perform the sobriety tests required to conduct a DWI investigation, he called in a specialized and more highly trained DWI enforcement officer for two reasons: first, he wanted the investigation performed in strict compliance with investigatory procedures because the suspect was an assistant district attorney and second, it was police department policy for patrol officers to call in DWI enforcement officers. Consequently, we hold that the means employed here, and thus the delay and detention of Dickson, were not unreasonable because they were necessary to effectuate an important law enforcement purpose—compliance with police department policy.

Dickson claims that the Fourth Amendment does not allow officers to delay investigations simply because they desire more ideal conditions under which they may conduct the investigations or because they are uncomfortable with the circumstances. Dickson insists that *Collier v. State*, 843 S.W.2d 176 (Tex. App.—Houston [14th Dist.] 1992, no pet.), supports this argument. As both the trial judge and Dickson's trial counsel agreed, *Collier* does not stand for this proposition. In *Collier*, officers stopped a car suspecting that it contained drugs. *Id*. at 177. After the occupants of the car denied any involvement in drug transactions and a search of the car failed

8

to turn up any drugs, the officers continued to detain a female passenger for twenty minutes while waiting for a female officer to arrive and frisk her. *Id*. While they were waiting, one passenger attempted to discard some cocaine and was arrested. *Id*. The court of appeals determined that the detention was unreasonable because searching the car and questioning its occupants failed to elicit facts sufficient to find probable cause for an arrest or continued detention, thus rendering the continued detention unreasonable and making any evidence uncovered as a result inadmissible. *Id*.

Here, Officer Santos stopped Dickson because he was driving erratically and then Santos noticed the odor of alcoholic beverages on Dickson's breath. These facts support a finding of probable cause for a continued detention in order to investigate Santos's suspicion that Dickson was intoxicated. Consequently, Dickson's reliance on *Collier* is misplaced.

For the reasons discussed above, we hold that the trial court did not abuse its discretion in finding Santos's call for a specialized DWI investigator both reasonable and necessary to serve an important law enforcement purpose. Dickson's first point of error is overruled.

**Voluntary Consent**

In his second point of error, Dickson contends that the trial court erred in denying his motion to suppress because Herring coerced him into submitting a breath sample by issuing extra-statutory warnings that rendered Dickson's consent involuntary.

In Texas, a person's consent to the taking of samples for a blood or breath test is implied if he has been arrested for an offense alleged to have arisen out of acts committed while operating a motor vehicle in a public place while intoxicated. Tex. Transp. Code Ann. § 724.011(a) (West Supp. 2006). However, before an officer can request a blood or breath sample from an

9

arrestee, he must inform the arrestee orally and in writing of the following statutory warnings: (1) that his refusal to submit may be admissible in a subsequent prosecution and (2) that his refusal to submit will result in the automatic suspension of his driver's license. *Id*. § 724.015(1)-(2) (West Supp. 2006).

An arrested person's decision to submit to a breath or blood test must be his own and must be freely made with a correct understanding of the statutory consequences of refusal. *Erdman*, 861 S.W.2d at 893. To be voluntary and thus consistent with the statutory scheme, the decision to provide a sample must not result from physical or psychological pressures brought to bear by law enforcement officials. *Id*.; *Sandoval v. State*, 17 S.W.3d 792, 795 (Tex. App.—Austin 2000, pet. ref'd). Consent is not voluntary if it is induced by an officer's misstatement of the consequences flowing from a refusal to give a specimen. *Erdman*, 861 S.W.2d at 894.

In *Erdman*, the officer warned the suspect that if he refused to take the test, then (1) evidence of his refusal would be admissible against him in a subsequent prosecution, (2) his driver's license would be suspended for ninety days, (3) DWI charges would be filed against him, and (4) he would be placed in jail that night. *Id*. at 891. After receiving the warnings the suspect consented to the Intoxilyzer test, which indicated that he was legally intoxicated. *Id*. The court of criminal appeals held that the third and fourth warnings were extra-statutory and were of a type "that would normally result in considerable psychological pressure upon a DWI suspect." *Id*. at 894. Therefore, the court of criminal appeals held that the suspect's consent to Intoxilyzer testing was rendered involuntary. *Id*. The *Erdman* court explicitly noted that "law enforcement officials must take care to warn DWI suspects correctly about the actual, direct, statutory consequences of refusal. Any other

10

information conveyed to DWI suspects may have the effect—either intended or unintended—of undermining their resolve and effectively coercing them to consent. *Id*.

Here, there is evidence that Dickson had an understanding of the statutory consequences of refusal as well as an understanding of the types of questions that he needed to ask to elicit an answer that would allow him to contend that his consent was involuntary. Herring was aware that Dickson likely possessed special knowledge of this area of the law and he shared his suspicion with Dickson at several points during the investigation and with the court during his testimony. The record shows that Herring followed procedure by having Dickson read the statutory warnings along with him. When Dickson began asking questions regarding whether he would be let go if he passed the breath test, Herring replied "no" and referred him back to the statutory warnings on several different occassions. When Dickson asked again about being released, Officer Herring told Dickson that he "already knew the answer to that." Dickson persisted in his questioning, asking whether his refusal to submit to a breath test would result in an arrest; Herring responded that Dickson was already under arrest and would remain under arrest regardless of whether he submitted to the breath test. Throughout Dickson's questioning, Herring continued to answer in ways intended to avoid misstating the ramifications of refusing to submit a breath sample. Rather than misstating the law or any consequences that might flow from Dickson's refusal to submit to the breath test, Herring accurately stated that Dickson was already under arrest and would remain under arrest regardless of whether he submitted to testing.

Dickson seems to focus on one key point in the exchange to argue that an *Erdman*-type extra-statutory warning was given. After Herring had stated repeatedly that the statutory

11

warnings were the only ones that would be given to Dickson and that Dickson was already under arrest whether or not he gave a sample, Dickson asked "so if I don't give a sample, then, I'm going to jail?" Officer Herring replied "[r]ight if you do give a sample, you may end up there also. Just the same fate. It's just up to you. Your answers are final answers. I'm not going to debate you back and forth." Following this exchange, Herring continued to refer Dickson to the statutory warnings in response to his questions and at one point Herring candidly admitted that he did not want to give the impression that he was trying to "lead Dickson one way or the other." Dickson responded that it was not his position that Herring was attempting to lead him one way or the other.

On appeal, Dickson now insists that Herring's statement coerced him into providing a breath sample. To the contrary, the actual exchange shows that Herring was telling Dickson that he would be going to jail whether he gave a sample or not because, as Herring had previously told Dickson, he was already under arrest. While Herring asked Dickson on two separate occasions whether he would submit to a breath test before he acquiesced, Herring did not provide any extra-statutory warnings that would have caused psychological pressure sufficient to coerce Dickson into submitting and, as a result, his statements did not render Dickson's consent involuntary. Herring showed discipline in scrupulously avoiding any statements that were out of bounds despite Dickson's attempts to solicit extra-statutory warnings and build *Erdman* error into the investigation. Herring repeatedly informed Dickson that he was already under arrest and would remain so regardless of whether or not he submitted to a breath test.

The purpose behind the ruling in *Erdman* was to protect a suspect from having evidence of a failed Intoxilyzer test used against him when his consent to testing was obtained

12

through coercion by a police officer's use of extra-statutory warnings that would normally result in considerable psychological pressure. *Id*. In this case, any statements given beyond the statutory warnings were a product of Dickson's use of his knowledge of the law in this area to question Herring in an attempt to elicit an extra-statutory response for later use at trial. The trial court's finding that there was no *Erdman* violation is supported by Herring's testimony, as well as the video tape of Dickson's detention. The trial court did not abuse its discretion in finding that Dickson was not coerced and denying the motion to suppress. Dickson's second point of error is overruled.

## CONCLUSION

Having overruled each of Dickson's points of error, we affirm the trial court's judgment.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Pemberton and Waldrop

Affirmed

Filed: December 6, 2006

Do Not Publish

13