

Court Of Appeals

Fourth Court of Appeals District of Texas
San Antonio

★ ★ ★ ★ ★ ★



# MEMORANDUM OPINION

Nos. 04-09-00293-CR,
04-09-00294-CR, &
04-09-00295-CR

William Allen **PAULEA** III,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 198th Judicial District Court, Kimble County, Texas
Trial Court Nos. 08-1711, 08-1712, & 08-1713
Honorable Emil Karl Prohl, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Karen Angelini, Justice
Steven C. Hilbig, Justice, concurring in the judgment only
Marialyn Barnard, Justice

Delivered and Filed: March 24, 2010

AFFIRMED

William Allen Paulea was found guilty of possession of cocaine, possession with intent to deliver methamphetamine, and possession of child pornography. In nine appellate issues, Paulea complains (1) the trial court erred in denying his motion to suppress, and (2) the evidence was legally insufficient to sustain his conviction for possession with intent to deliver methamphetamine. We affirm the trial court's judgment.

## BACKGROUND

Police officers Slade Fisher and George Kirchman were dispatched to the Days Inn Hotel in Junction, Texas after receiving a call from the hotel clerk regarding hotel guest, Clay Pratt, who was reportedly engaging in lewd behavior in a second floor hotel hallway. Officer Fisher arrived first, and thereafter, Officer Kirchman arrived. After finding Pratt in the hallway, the officers arrested Pratt for public intoxication and disorderly conduct. After Pratt was placed under arrest, the hotel clerk retrieved Pratt's room key. The hotel clerk determined the key belonged to room 109, the room was occupied by two adults, and registered to Paulea. The hotel clerk relayed this information to Officer Fisher and expressed concern over Pratt's actions and the damage done to the property. Officer Fisher went to room 109.

According to Officer Fisher, he knocked on the door, announced "Sheriff's office," and heard movement inside the room. After knocking on the door again and announcing "Sheriff's office," Paulea answered, opening the door about six inches. Officer Fisher identified himself, told Paulea about Pratt's arrest, and said he would like to talk to Paulea. Officer Fisher testified that when Paulea stepped outside to talk with him, he smelled the odor of burnt marijuana, and saw through the open door a glass bong and pipe on the bedside table between the two beds. Officer Fisher placed Paulea in handcuffs, advising Paulea he was not under arrest, but was being detained. Officer Fisher testified he placed Paulea in handcuffs for officer safety.

Officer Fisher said he then called Officer Kirchman, and while waiting for Officer Kirchman, advised Paulea to sit in a chair outside room 109. Paulea remained in handcuffs. Thereafter, Chief Steve Brown arrived and was advised of the situation. According to Chief Brown and Officer Fisher, Paulea gave the officers permission to enter room 109 so the three of them could talk. The three men

entered the room. Chief Brown walked to the back of the room, checking for other occupants. He commented that the room smelled like burnt marijuana. While the three men were in the room, Chief Brown advised Paulea of his rights, including his *Miranda* rights, and asked for consent to search the room. According to the officers, Paulea verbally consented to the search of the room.

Paulea testified he had been sleeping when he heard Officer Fisher knock on the door. When he heard knocking, he woke up and cracked the door open to see who was there. Paulea testified that after Officer Fisher told him to open the door, he closed the door to disengage the safety chain and reopened the door. Paulea testified that after he opened the door, Officer Fisher asked him to step aside, and Officer Fisher entered the room. According to Paulea, Officer Fisher used a flashlight to look inside the room and after looking around the room, Officer Fisher instructed Paulea to step outside, where he was placed in handcuffs. Shortly after he was placed in handcuffs and instructed to sit in a chair in the hallway, Chief Brown arrived. Chief Brown and Officer Fisher then began to search his room, including his luggage.

During the search, Officer Morgan arrived. The officers found an HP laptop computer inside one of Paulea's bags, a projector on top of the bed, and some external hard drives in another bag. According to Chief Brown, he asked Paulea for consent to conduct a forensic examination of the computer equipment, and Paulea stated "that's fine." Officer Morgan confirmed Paulea's consent to a search of the computer equipment. Paulea admitted giving Chief Brown permission to look at his computer, but denied giving the officers permission to conduct a "preliminary" or "forensic" search of his computer. Paulea admitted his computer had pornography on it, but denied the presence of any child pornography. When Officer Morgan indicated he would have to examine the evidence at the station, Paulea gave Officer Morgan the password to the computer.

After the search, Paulea was arrested for possession of drug paraphernalia. The officers searched Paulea incident to his arrest, and in his pant pockets found an assortment of ziploc bags: two clear ziploc bags containing a white crystalline substance, a purple ziploc bag containing a white substance, a clear ziploc bag containing nine blue tablets, and a small ziploc bag with a spades design containing a white powder residue. Paulea was then taken to jail, and the computer equipment was taken to the Junction Police Department for examination. At the jail, Chief Brown presented Paulea with a written consent form, which Paulea signed. The form authorized a search of room 109 at the Days Inn Hotel, a search of a vehicle, and the removal of any seized property from the room. The form, however, made no reference to a forensic examination of the computer.

Meanwhile, at the Junction Police Department, Officer Morgan began a preliminary examination of the computer. The preliminary examination consisted of turning the computer on, entering the password, and viewing documents and files. Officer Morgan found a folder with images that appeared to be child pornography. He transferred the images from the computer onto a disc, closed the computer, and marked the items as evidence. The computer evidence was then transferred to the FBI for a forensic examination. The FBI transferred the computer evidence to North Texas Regional Computer Forensic Laboratory, and subsequently, the computer evidence to the Attorney General's Office. Forensic examiner, Lieutenant Lannes Hilboldt, conducted a forensic examination of the laptop's hard drive and retrieved fifteen images alleged to contain child pornography. These images were ultimately offered into evidence.

The officers also submitted the retrieved ziploc bags to the Austin lab of the Texas Department of Safety. Drug analyst, Joel Budge, performed an analysis of each bag and found each to contain the following controlled substances: .48 grams of cocaine (the white powder substance);

1.44 grams of methamphetamine (the white crystalline substance); .78 grams of methamphetamine (the white crystalline substance); 2.62 grams of methamphetamine and 3.4 methylenedioxyamphetamine (the nine blue tablets); and a trace of cocaine (the white powder substance). During trial, each bag was admitted into evidence.

Paulea was charged in cause number 08-1711 with possession of a controlled substance, namely cocaine, in cause number 08-1712 with possession with intent to deliver a controlled substance in an amount over four grams, namely methamphetamine, and cause number 08-1713 with fifteen counts of child pornography. Paulea pled not guilty and filed a written motion to suppress, challenging the legality of his detention and arrest, and seeking to suppress all evidence seized. The trial court denied the motion, and the case proceeded to jury trial. The jury found Paulea guilty of possession of cocaine and possession of child pornography. Paulea was also found guilty of the lesser included offense of possession of methamphetamine with intent to deliver a controlled substance in an amount of more than one gram but less than four grams. Punishment was assessed at two years for cocaine possession and ten years each for possession of methamphetamine with intent to distribute and possession of child pornography. This appeal followed.

### STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's ruling, we may not engage in our own factual review; instead we defer to the trial judge, who is the sole trier of fact and judge of the credibility of the witnesses and weight to be given to their testimony. *Weide v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000),

*modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). The trial court has the opportunity to observe the witnesses' demeanor and appearance, and as a result, the trial court is entitled to believe or disbelieve all or part of the witnesses' testimony, even if the testimony is uncontroverted. *Ross*, 32 S.W.3d at 855. Accordingly, we give a great deal of deference to the trial court's determination of historical facts; however, we review the trial court's application of the law to those facts de novo. *Amador*, 221 S.W.3d at 673.

Additionally, when reviewing a trial court's ruling on a motion to suppress, we must view all the evidence in the light most favorable to the trial court's ruling. *State v. Iduarte*, 268 S.W.3d 544, 548 (Tex. Crim. App. 2008); *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex. Crim. App. 2006). If the trial court makes explicit fact findings, we must determine whether the evidence supports those findings by viewing that evidence in the light most favorable to the trial court's ruling. *Id.* We then review the trial court's legal ruling de novo, and we will uphold the ruling so long as it is supported by the record and correct under any theory of law applicable to the facts in the case. *Iduarte*, 268 S.W.3d at 548.

## DISCUSSION

In his first seven issues, Paulea contends the trial court erred in denying his motion to suppress the evidence seized from his hotel room. Specifically, Paulea argues Officer Fisher did not have reasonable suspicion or probable cause to lawfully detain or arrest him, and such actions were in violation of the Fourth Amendment of the United States Constitution and Chapter 14 of the Texas Code of Criminal Procedure. Paulea argues the officers conducted a warrantless search of his hotel room, and any purported consent given to search the room was tainted by the alleged illegal, warrantless detention and arrest. Moreover, he claims the trial court erred in finding he voluntarily

consented to the entry and search of his hotel room, or to the forensic search of his computer equipment. Paulea contends that as a result of the officers' warrantless detention, arrest, and search, the trial court erred in denying his motion to suppress.

### *Burden of Proof*

In order to properly suppress evidence based on an alleged Fourth Amendment violation, the defendant bears the burden of producing evidence that rebuts the presumption of proper law enforcement conduct. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). A defendant sufficiently satisfies his burden if the search or seizure occurred without a warrant. *Id.* Once the defendant satisfies his burden, the burden of proof shifts to the State, which is required to prove the search or seizure was conducted either pursuant to a warrant or was reasonable. *Id.* Texas statutory law is silent as to how the burden of proof is distributed in a hearing on a motion to suppress. *See* TEX. CODE. CRIM. PRO. art. 28.01, § 1(6) (Vernon 2009); *Pham v. State*, 175 S.W.3d 767, 773 (Tex. Crim. App. 2005). Texas adopts, at least in some respects, the rules followed by federal courts in the distribution of burdens of proof. *Pham*, 175 S.W.3d at 773.

Here, neither the seizure of Paulea's person nor the search of his hotel room and computer equipment was conducted pursuant to a warrant.[1] As a result, the State bore the burden of establishing the reasonableness of the detention, arrest, and subsequent search. *See Ford*, 158 S.W.3d at 492; *Pham*, 175 S.W.3d at 773.

---

[1] The State does not dispute the claim that Paulea's detention, subsequent arrest, and search of Paulea's room and computer were conducted without a warrant. Instead, the State contends Paulea's detention was lawful and based on reasonable suspicion, Paulea's subsequent arrest was lawful and based on probable cause, because the facts show the officers witnessed Paulea commit an offense within their presence, and the search of the room and computer were lawful because Paulea voluntarily consented.

Accordingly, we examine in chronological order each aspect of Paulea's 1) detention, 2) arrest, and 3) subsequent search to determine if they were reasonable.

### 1) Consensual Encounter Versus Detention

Paulea argues Officer Fisher did not have reasonable suspicion to lawfully detain him outside the hotel room. Specifically, Paulea argues the following events constituted an unlawful detention when: 1) Officer Fisher knocked on the door and announced "Sheriff's office;" 2) Paulea partially opened the door; 3) Officer Fisher advised Paulea of the situation with Pratt and asked Paulea if he could come outside to speak with him; and 4) Paulea responded, "Okay" and exited the room. Based on these events, Paulea asserts Officer Fisher did not have reasonable suspicion to ask him to step outside and speak with him.

Interactions between police officers and citizens fall within three categories: an encounter, detention, or arrest. *State v. Perez*, 85 S.W.3d 817, 819 (Tex. Crim. App. 2002). Whether an officer engages in an encounter or a detention requires us to review the following guidelines. An encounter is a consensual interaction between a police officer and a citizen, in a public place, that does not require reasonable suspicion or implicate constitutional rights. *Perez*, 85 S.W.3d at 819. A police officer may approach a citizen and talk to him without any suspicion so long as the encounter is consensual and not unreasonably lengthy. *Id*. Additionally, an officer may knock on a citizen's closed door without any suspicion and ask him if he is willing to answer questions. *Id*. Whether an encounter constitutes a seizure for consideration of the Fourth Amendment depends on the specific facts of the situation, the degree of police authority displayed, and all other surrounding circumstances. *State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008). "It is only

when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen,'" that a seizure occurs. *Id*. at 242.

An investigative detention is a type of seizure that occurs when an individual is encountered by a police officer, yields to the officer's display of authority, and is temporarily detained. *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995). A person yields to an officer's display of authority when a person would not feel free to leave and terminate the encounter. *Id.* at 234-35. An officer may conduct a lawful and temporary investigative detention when he has reasonable suspicion to believe a person is violating the law. *Ford*, 158 S.W.3d at 492; *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). "Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Ford*, 158 S.W.3d at 492. Reasonable suspicion operates under an objective standard and disregards any subjective intent an officer may have had when making the stop; therefore, we look solely to whether an objective basis for the stop exists. *Id.* In making our determination of whether reasonable suspicion exists, we use a totality of the circumstances approach. *Id.* at 492-93.

In this case, the trial court made the following relevant factual findings to which we must defer. *See Amador*, 221 S.W.3d at 673. After arresting Pratt and listening to the hotel clerk's concern regarding Pratt's behavior, Officer Fisher "proceeded to Room 109 to check the health and welfare of the other occupant in the room." Officer Fisher knocked on the door, stating "Sheriff's office," and after hearing movement inside the room, he knocked again. Paulea answered, and Officer Fisher informed Paulea of the situation with Pratt and asked Paulea to step outside. Paulea replied. "Okay." As Paulea exited the room, Officer Fisher "smelled the odor of burnt marijuana

while standing outside the door on the sidewalk in front of Room 109" and "clearly observed a 'bong' and [']silver metal pipe' in 'plain view' on the bedside table, which was immediately known to him as a device used to smoke some type of illegal substance." Officer Fisher then advised Paulea he was being detained for investigative purposes and was not under arrest. Thereafter, Officer Fisher handcuffed Paulea and waited until Chief Brown arrived to the scene. The record supports these factual findings, and therefore, we must defer to these facts in our analysis. *See Iduarte*, 268 S.W.3d at 548; *Amador*, 221 S.W.3d at 673; *Kelly*, 204 S.W.3d at 818-19.

After reviewing these facts using a totality of the circumstances approach, we hold the activity before Paulea was placed in handcuffs was a consensual encounter. *See State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008) (indicating officers are free to approach and knock on citizens' doors and ask to talk with them and such conduct does not elevate to status of a seizure until officer engages in threatening or coercive behavior). Here, Officer Fisher could freely knock on Paulea's hotel room door and ask to talk to him. *See id.* at 243; *Capuchino v. State*, 389 S.W.2d 296, 298 (Tex. Crim. App. 1965) (highlighting that officer may knock on door to hotel room just as he may knock on front door of private home without implicating Fourth Amendment); *Bouyer v. State*, 264 S.W.3d 265, 270 (Tex. Crim. App.—San Antonio 2008, no pet.) (pointing out it was defendant's choice to open door, allowing officers to observe items in plain view). We do not agree with Paulea that asking a person to exit his or her hotel room to talk amounts to "conduct which a reasonable man would view as threatening or offensive." *See Garcia-Cantu*, 253 S.W.3d at 243. Nothing in the record indicates Officer Fisher's actions up to this point amounted to the use of physical force or a show of authority that restrained Paulea from leaving. *See id.* at 242. In fact, an officer may knock and stand outside a person's door without violating constitutional prohibitions,

and it is that person's choice to open the door and comply with an officer's requests. *See Bouyer*, 264 S.W.3d at 717 (highlighting it was defendant's choice to open door to speak with officers). Accordingly, this interaction did not constitute an unlawful detention.

It was not until Officer Fisher, after smelling burnt marijuana and seeing the drug paraphernalia in the room, placed Paulea in handcuffs and advised Paulea he was being detained that Paulea was being kept against his will, and therefore detained for Fourth Amendment purposes. *See Garcia-Cantu*, 253 S.W.3d at 242-43. After viewing the facts surrounding Paulea's detention under a totality of the circumstances approach, we hold Officer Fisher had reasonable suspicion to detain Paulea. Although Paulea argues Officer Fisher did not have reasonable suspicion to detain him, Officer Fisher relayed to the trial court specific, articulable facts, such as finding Pratt masturbating and defecating on the floor, believing Pratt was staying in room 109, talking to Paulea about Pratt's situation outside the door on the sidewalk, smelling burnt marijuana while standing outside Paulea's hotel door, and clearly observing through the opened door drug paraphernalia on the bedside table to indicate he had reasonable suspicion. *See Taylor v. State*, 20 S.W.3d 51, 56 (Tex. App.—Texarkana 2000, pet. ref'd) (explaining odor of marijuana alone provides reasonable suspicion to justify continuing detention); *Mohmed v. State*, 977 S.W.2d 624, 628 (Tex. App.—Fort Worth 1998, pet. ref'd) (holding smell of marijuana creates reasonable suspicion for officer to continue detention for investigation of drug possession). We agree with the State. Here, Officer Fisher testified these facts led him to believe Paulea was using marijuana. Therefore, Officer Fisher had reasonable suspicion to detain Paulea.

### *2) Detention Versus Arrest*

Paulea also contends the initial detention turned into an illegal arrest in violation of the Fourth Amendment of the United States Constitution and Chapter 14 of the Texas Code of Criminal Procedure when Officer Fisher placed him in handcuffs outside the hotel room. Paulea argues he was under arrest because a reasonable person would not have believed he was free to leave after being asked to exit his hotel room, handcuffed, and later Mirandized.[2] Paulea argues the State failed to demonstrate probable cause existed for his warrantless arrest.

As mentioned above, an officer may briefly detain a person reasonably suspected of criminal activity in the absence of probable cause to arrest that person. *Ford*, 158 S.W.3d at 492; *Balentine*, 71 S.W.3d at 763. In contrast to such an investigative detention, an arrest is a greater restraint on a person's freedom to move or leave. *State v. Sheppard*, 271 S.W.3d 281, 290 (Tex. Crim. App. 2008). To make a warrantless arrest for an offense committed in the officer's presence under the Fourth Amendment, an officer must have probable cause. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). Probable cause exists when the facts and circumstances of which an officer has personal knowledge or of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense was or is being committed. *Id*.

In Texas, a person may be arrested without a warrant if there is probable cause and the arrest falls within one of the specified provisions of one of the statutes authorizing a warrantless arrest. *Buchanan v. State*, 207 S.W.3d 772, 775-76 (Tex. Crim. App. 2006) (highlighting neither Fourth Amendment nor Texas Constitution requires a warrant to justify a public arrest); *Johnson v. State*,

---

[2] A review of the record indicates Paulea was not Mirandized until after Chief Brown arrived and the three men, Officer Fisher, Chief Brown, and Paulea, entered the room.

32 S.W.3d 294, 298 (Tex. App.—San Antonio 2000, pet. ref'd). In Texas, the requirement for an arrest warrant is purely statutory and governed by Chapter 14 of the Texas Code of Criminal Procedure. *Buchanan*, 207 S.W.3d at 775-76. Article 14.01(b) of chapter 14 of the Code of Criminal Procedure permits an officer to arrest an individual for an offense committed in his presence or within his view. TEX. CODE. CRIM. PRO. ANN. art. 14.01(b) (Vernon 2009); *Johnson*, 32. S.W.3d at 298. Whether probable cause for making a warrantless arrest pursuant to article 14.01(b) exists depends on whether, at the time of the arrest, the facts and circumstances within the arresting officer's knowledge, and of which he had reasonably trustworthy information, were sufficient to warrant a prudent man to believe the suspect had committed or was committing an offense. *Johnson*, 32. S.W.3d at 298.

The use of handcuffs does not necessarily constitute an arrest or custody. *Rhodes v. State*, 945 S.W.2d 115, 117-18 (Tex. Crim. App. 1997). Although "[t]here is no bright-line test providing that mere handcuffing is always the equivalent of an arrest[,]" officers may use any force necessary to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety. *See Balentine*, 71 S.W.3d at 763; *Rhodes*, 945 S.W.2d at 117. Whether a case involves a detention or an arrest depends on several factors, including:

> . . . the amount of force displayed, the duration of a detention, the efficiency of the investigative process and whether it is conducted at the original location or the person is transported to another location, the officer's expressed intent - that is, whether he told the detained person that he was under arrest or was being detained only for a temporary investigation, and any other relevant factors.

*Sheppard*, 271 S.W.3d at 291.

Here, in addition to the above mentioned factual findings, the trial court made the following relevant factual findings to which we defer. *See Amador*, 221 S.W.3d at 673. Handcuffed, Paulea

remained with Officer Fisher outside the hotel room until Chief Brown arrived. When Chief Brown arrived, the three men went into the hotel room, where Chief Brown told Paulea he could smell burnt marijuana and see drug paraphernalia on the bedside table. After conducting a search for narcotics,[3] Chief Brown ordered Officer Kirchman to arrest Paulea for possession of drug paraphernalia.

After reviewing these facts, the investigative stop did not evolve into an arrest until Chief Brown informed Paulea that he was being arrested for possession of drug paraphernalia. We do not agree with Paulea that the officers' earlier actions, including handcuffing and Mirandizing him, turned his detention into an arrest because such actions were necessary to effectuate the goal of the detention and subsequent search for narcotics. *See Balentine*, 713 S.W.3d at 763; *Rhodes*, 945 S.W.2d at 117. Here, the record reflects Paulea was handcuffed after Officer Fisher saw drug paraphernalia on Paulea's bedside table. Officer Fisher testified Paulea's handcuffed detention was for officer safety. Additionally, the trial court found Paulea "remained in handcuffs to prevent his tampering with any potential evidence of the violation that had been observed." These safety concerns were reasonable, given the circumstances:

- Officer Fisher arrested Pratt for bizarre behavior;
- Pratt was believed to be staying with Paulea in room 109;
- Officer Fisher expressed concern for the health and welfare of Paulea's condition;
- Officer Fisher saw a "bong" and "silver metal pipe," which based on his training and experience immediately knew to be drug paraphernalia, on the bedside table when Paulea opened the door;
- Officer Fisher informed Paulea of this observation as well as the smell of burnt marijuana; and.
- Officer Fisher advised Paulea that he was only being detained and not under arrest, and while alone together, the two men waited in the hallway for other officers to arrive on the scene.

---

[3] Whether the search was consensual is an issue we separately discuss.

Similarly, Chief Brown advised Paulea he was not being arrested, and went on to advise Paulea of his *Miranda* rights,[4] his right to consent to a search of the room, as well as his right *not* to consent to a search of the room. The three men remained in the hotel room with Paulea seated in a chair, and as soon as the officers realized they would need to take the computer equipment back to the station, they informed Paulea he was being arrested for possession of drug paraphernalia. This is when the arrest occurred, and at that time, there was probable cause for the arrest given Paulea's possession of drug paraphernalia within the officers' view. *See Amador*, 275 S.W.3d 878 ; *Ramirez v. State*, 105 S.W.3d 730, 740 (Tex. App.—Austin 2003, no pet.) (pointing out officer had probable cause to arrest defendant, who was already handcuffed and advised he was being detained, when officer told defendant he could see drugs and drug paraphernalia); *Waugh v. State*, 51 S.W.3d 714, 717 (Tex. App.—Eastland 2001, no pet.) (highlighting probable cause existed where officers, who based on their experience and training, relayed they saw drug paraphernalia, specifically a bong, through open door); *Johnson*, 32. S.W.3d at 298.

Accordingly, Officer Fisher and Chief Brown's investigative detention did not evolve into an arrest, as Paulea contends, simply because Paulea was asked to exit his hotel room and subsequently handcuffed after Officer Fisher saw what he believed to be drug paraphernalia in the hotel room. Officer Fisher and Chief Brown did only that which was reasonably necessary to ensure their own safety while investigating Paulea's possible involvement with Pratt's activities. *See Balentine*, 71 S.W.3d at 763; *Rhodes*, 945 S.W.2d at 117.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

### *3) Consent to Search and Whether Such Consent was Tainted*

Paulea next contends that as a result of the warrantless detention and arrest, any purported consent to enter and search his hotel room was tainted. Paulea argues his consent to enter and search the hotel room were an exploitation of Officer Fisher's unlawful detention and arrest. Paulea also challenges the voluntariness of the verbal consent to enter and search his hotel room and the forensic search of his computer. He argues the trial court committed reversible error in finding he voluntarily consented. Because these issues are closely related, we will discuss them together in chronological order, beginning with our conclusion that Paulea's consent to enter and consent to search his hotel was freely and voluntarily given.

Consent to search is an exception to the warrant requirement of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000); *State v. Ibarra*, 953 S.W.2d 242, 243 (Tex. Crim. App. 1997). For consent to be valid, it must be voluntarily given, and whether consent is given voluntarily is a question of fact considered by the totality of the circumstances. *Carmouche*, 10 S.W.3d at 331. The State bears the burden of proof to show by clear and convincing evidence that consent was freely given. *Ibarra*, 953 S.W.2d at 245. The following factors are considered to determine voluntariness: the accused's youth, education, intelligence; whether the accused received constitutional advice; the length of the detention; the repetitiveness of the officers' questioning; and the use of physical punishment. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000).

In this case, the trial court could have reasonably found that Paulea voluntarily consented to the officers' entry and search of his hotel room. The trial court made the following findings of fact:

- When Chief Brown asked Paulea if he and Officer Fisher could enter his room with him and continue the conversation, Paulea stated, "Sure."

- After telling Paulea he could smell burnt marijuana, Chief Brown asked Paulea if he could search the room for narcotics.
- Chief Brown advised Paulea "that he did not have consent to the search of the room, but that he was requesting consent to search the hotel room for narcotics or drugs of any kind."
- Chief Brown "advised [Paulea] that he had certain rights and proceeded to Mirandize [] Paulea."
- Paulea responded, "That's fine, go ahead and search."

The record supports these factual findings.

Although Paulea was placed in handcuffs after Officer Fisher observed drug paraphernalia in his room, the detention was brief; there was no repetitiveness in questioning by either Officer Fisher or Chief Brown; the officers informed Paulea of his right to refuse to consent to search, and there was no use of physical punishment. There is no evidence Paulea's will was overborne to such an extent that he felt coerced by the situation to consent to the entry and search of his room. Accordingly, looking at the totality of the circumstances, we hold the record supports a finding by clear and convincing evidence that Paulea's verbal consent was voluntary. *See Ibarra*, 953 S.W.2d at 245. Therefore, the trial court did not err in entering a finding Paulea voluntarily consented to the entry and search of his hotel room.

Next, given that we have concluded Paulea's detention and subsequent arrest were lawful, Paulea's argument that his illegal warrantless detention and arrest tainted his purported consent is baseless. Accordingly, Paulea's consent to enter and search his room was not an exploitation of an unlawful detention or arrest by Officer Fisher.

Lastly, after the officers observed the computer equipment and projector pointed toward the wall as if to project an image in the room, Chief Brown asked Paulea if there was any illegal pornography on the computer. Although Paulea did not directly answer the question, he admitted the computer contained pornography. The factual findings also establish that "Chief Brown advised

[] Paulea that he had a Constitutional right not to have a search made of the computer and related media without a search warrant," and that "he could revoke his consent at any time once given." Chief Brown asked for permission to search the computer, and Officer Morgan informed Paulea "that it would take a while for a forensic examination of the computer and hard drives and it would have to go back to the police station and then possibly be sent to a computer lab." Paulea then agreed to the forensic search and even gave the officers his computer password. Paulea was then arrested for possession of drug paraphernalia and transferred to the jail, where he signed a written consent form to search his hotel room and vehicle.

Again, the record supports the trial court's factual findings, and after giving deference to those findings and viewing the evidence in the light most favorable to the trial court's ruling, we conclude the trial court could have reasonably found by clear and convincing evidence that Paulea voluntarily consented to the forensic search of his computer equipment. *See Iduarte*, 268 S.W.3d at 548; *Kelly*, 204 S.W.3d at 818-19; *Ibarra*, 953 S.W.2d at 245. Paulea was informed of his rights to consent or not to consent to a search of his computer; the officers explained that a forensic search would require the computer equipment to be transferred to the police station and sent to a computer lab; there was no repetitiveness in questioning by the officers; and there was no use of physical punishment. And although Paulea contends the written form did not specifically consent to a forensic search of the computer equipment, based on the officers' request to search the computer equipment and explanations of the forensic search to Paulea while at the hotel, the trial court could have reasonably found by clear and convincing evidence that Paulea voluntarily consented to the forensic search before his arrest and before he was transported to jail. Therefore, the trial court did

not err in entering a finding Paulea voluntarily consented to the forensic search of his computer equipment.

Accordingly, we hold the trial court did not err in denying Paulea's motion to suppress, and overrule Paulea's first seven issues.

### *Legal Sufficiency*

Paulea next argues the evidence was legally insufficient to sustain his conviction for possession with intent to deliver methamphetamine. Not attacking the sufficiency of the evidence to show his possession of various drugs, Paulea challenges the sufficiency of the State's evidence to show he possessed methamphetamine with an intent to distribute or deliver the drugs to another person. According to Paulea, no rational trier of fact could have found beyond a reasonable doubt that he possessed methamphetamine with an intent to deliver.

In deciding whether the evidence is legally sufficient to support a conviction of possession with intent to deliver, we "must assess all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *See Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We give deference to the trier of fact to "fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We may also give careful consideration to all the evidence admitted, whether proper or improper, as well as direct or circumstantial. *Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). As the sole judge of the witnesses' credibility and weight to be given to the evidence, the jury

is free to accept or reject any or all the evidence presented by either side. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

A person commits the offense of possession with intent to deliver methamphetamine if he knowingly or intentionally possessed methamphetamine of at least one gram but less than four grams with the intent to deliver it. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) (Vernon Supp. 2009); *Moreno v. State*, 195 S.W.3d 321, 325 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *Nhem v. State*, 129 S.W.3d 696, 699 (Tex. App.—Houston [1st Dist.] 2004, no pet.). "In a possession with intent to deliver case, the State must prove that the defendant: (1) exercised care, custody, control, or management over the controlled substance; (2) intended to deliver the controlled substance to another; and (3) knew that the substance in his possession was a controlled substance." *Nehm*, 129 S.W.3d at 699 (citing TEX. HEALTH & SAFETY CODE ANN. §§ 481.002(38), 481.112(a); *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1993); *Roberson v. State*, 80 S.W.3d 730, 734-35 (Tex. App.—Houston [1st. Dist.] 2002, pet. ref'd)). Intent to deliver may be established by expert testimony, such as testimony from experienced law enforcement, and circumstantial evidence, such as evidence of an accused's possession of the contraband. *Moreno*, 195 S.W.3d at 325; *Ingram v. State*, 124 S.W.3d 672, 675-76 (Tex. App.—Eastland 2003, no pet.). "Inferences can be made from the conduct of the defendant as well as the amount of the controlled substance possessed and the manner in which it was possessed." *Ingram*, 124 S.W.3d at 675-76. Other circumstantial factors which may establish intent include: "(1) the nature of the location at which the accused was arrested; (2) the quantity of contraband in the accused's possession; (3) the manner of packaging; (4) the presence or lack thereof of drug paraphernalia (for either use or sale); (5) the accused's possession of large amounts of cash; and (6) the accused's status as a drug user." *Moreno*, 195 S.W.3d at 325-

*26*; *Erskine v. State*, 191 S.W.3d 374, 380 (Tex. App.—Waco 2006, no pet.). And although the number of factors present are important to consider, the logical force the factors have in proving the elements of the offense is more important. *Moreno*, 195 S.W.3d at 326. Lastly, intent is a question of fact determined by the trier of fact. *Ingram*, 124 S.W.3d at 676.

When viewed in the light most favorable to the verdict, the evidence was legally sufficient to support Paulea's conviction of possession with intent to deliver a controlled substance, namely methamphetamine, in an amount greater than one gram but less than four grams. It appears the State based the possession of more than four grams of methamphetamine with intent to deliver charge on the facts that Paulea was in possession of various amounts of methamphetamine in different ziploc bags as well as in possession of ecstacy tablets, which he distributed to Pratt. The evidence shows Paulea was in possession of two ziploc bags, with one bag containing 1.44 grams of methamphetamine and a second bag containing .78 grams of methamphetamine. The evidence also shows Paulea was in possession of a third ziploc bag, which contained nine blue tablets. The blue tablets consisted of 2.62 grams of methamphetamine and 3.4 methylenedioxyamphetamine. The State presented testimony from Joel Budge, a drug analyst for the Texas Department of Public Safety, who testified methylenedioxyamphetamine, one of the substances found in the blue tablets, is commonly known on the street as ecstacy, and ecstacy is commonly marketed on the street in tablet form. Pratt testified he knew Paulea carried ecstasy tablets, and Paulea gave him half a tablet on their way to the hotel, and Paulea gave him another whole tablet after they arrived.

Accordingly, a review of the evidence clearly shows Paulea had custody, control, and management over the various bags of methamphetamine; Paulea possessed the controlled substance in marketable form; and Paulea was aware he was in possession of the controlled substances. *See*

*Nehm*, 129 S.W.3d at 699. Moreover, based on the several bags and tablet form in which Paulea kept methamphetamine, as well as the amount of the methamphetamine Paulea possessed, the jury could make a reasonable inference that Paulea possessed the methamphetamine with an intent to deliver. *See Ingram*, 124 S.W.3d at 675-76.

Although the State charged Paulea with possession with intent to distribute a controlled substance, namely methamphetamine, in excess of four grams, the jury rejected the charge in the indictment, and instead found Paulea guilty of the lesser offense of possession with intent to distribute methamphetamine in an amount of more than one gram but less than four grams. Here, as the sole judge of the witnesses' credibility and weight to be given to the evidence, the jury was free to accept or reject any or all the evidence presented by either side, and could reasonably conclude Paulea was in possession of more than one gram but less than four grams of methamphetamine with an intent to distribute. *See Wesbrook*, 29 S.W.3d at 111. Therefore, after viewing the evidence in the light most favorable to the verdict and determining a rational trier of fact could have reasonably believed beyond a reasonable doubt that Paulea possessed methamphetamine with an intent to distribute, we hold the evidence is legally sufficient to support Paulea's conviction for possession with intent to deliver methamphetamine in an amount in excess of one gram but less than four grams. *See Poindexter*, 153 S.W.3d at 405; *Jackson*, 443 U.S. at 319. Accordingly, we overrule Paulea's last issue on appeal.

### CONCLUSION

Based on the forgoing, we affirm the trial court's judgment.

Marialyn Barnard, Justice

DO NOT PUBLISH